**ORIGINAL**

1  SHAHROKH MIRESKANDARI
   And
2  PAUL BAXENDALE WALKER
   9903 SANTA MONICA BLVD
3  SUITE 406
   BEVERLY HILLS
4  CA, 90212
5  TELEPHONE 310.286.0500
   FAX: 310.286.0005
6  In Pro Per
7
8



FILED
CLERK, U.S. DISTRICT COURT
JUL – 2 2013
CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

UNITED STATES DISTRICT COURT
9
CENTRAL DISTRICT OF CALIFORNIA
10
WESTERN DIVISION
11
12        CV13-4796 DMG-Ex
          CASE NO.: _____
13  SHAHROKH MIRESKANDARI    )
        -and-                )
14  PAUL BAXENDALE WALKER     )
        Plaintiffs            )
15                           )
16        v                  )
                             )
17  BARRINGTON MAYNE, MALCOLM )
    LEES, DAVID MIDDLETON,   )
18  ANTONY TOWNSEND, RICHARD )
    HEGARTY, THE LAW SOCIETY OF )
19  ENGALND & WALES, THE      )
    SOLICITORS REGULATION    )
20  AUTHORITY, LUCY MONCRIEFF, )
    DES HUDSON, THE LEGAL     )
21  SERVICES BOARD, THE MINISTRY )
    OF JUSTICE, THE SOLICITORS )
22  DISCIPLINARY TRIBUNAL,    )
    PATRICK ROHRBACH, DAVID  )
23  GARDNER, JOSEPH SCOMA,    )
    ANDREW NICHOLAS PAVLOVIC )
24  LAURIE GILBERT, BIRD      )
25  MARELLA BOXER WOLPERT     )
    NESSIM DROOKS & LICENBERG PC )
    JENNIFER COON AND DOES 1-100 )
        Defendants           )

N/S

**COMPLAINT FOR COMPLAINT FOR VIOLATION OF RACKETEER INFLUENCED ANDCORRUPT ORGANIZATIONS ACT ('RICO'), 18 §1961 *ET SEQ*, COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. §1030, INTENTIONAL INTERFERENCE WITH CONTRACT, ANDDEFAMATION**

Plaintiff complains and for causes of action alleges as follows:

**PRELIMINARY ALLEGATIONS**
**INTRODUCTION**

1.     Plaintiffs are victims of an illegal pattern of racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 *et seq*, which began no later than 2004 and continues through the current date, perpetrated by certain Defendants to retaliate against outspoken minority solicitors, like Plaintiffs, for challenging powerful entities such as those sued in this case. The retaliation includes attacks on Plaintiffs' solicitor licenses as well as coordinating efforts with the racist tabloid the *Daily Mail* owned by Defendant Associated Newspaper, Ltd. ("ANL") to destroy reputations.

2.     In retaliation for SM's exposure of racial discrimination in the Defendant Law Society of England and Wales ("LSE") and its Solicitors Regulation Authority ("SRA") as well as the London Metropolitan Police in 2007- 2008, the LSE/SRA and *Daily Mail* began to implement their campaign of destruction, albeit not as quickly as the *Daily Mail* expected.

3.     On September 30, 2008, an internal LSE/SRA email to Defendant Townsend, copying Defendant Middleton and the LSE/SRA external media personnel, stated: "Steve Wright, the reporter who's been driving the *Daily Mail's* reporting of Mireskandari . . . has called me several times during the past few weeks asking what we are going to do about Mireskandari . . .Wright now says his patience with us is running out. He is amazed that we have not stopped Mireskandari from practicing long before now . . . Of course, it could all be bluster – though given what he has managed to publish during the past month, I wouldn't care to call his

bluff.  One reason for cajoling us is that action against Mireskandari by the SRA might strengthen the hand of Associated Newspaper any libel proceedings . . . However, I too am beginning to wonder how long it has to take us to deal with Mireskandari.  On several occasions since October 2007 we have been told that he is being treated as 'top priority'. <u>If the *Mail* really is able to clobber the SRA, it would probably want to run the story as a front-page lead. Currently the economic crisis is providing better material, but that won't go on forever. I will continue dealing with Wright as I have been. But I sense that the *Mail* does have material that would damage the SRA, and that time is running out.</u>" (emphasis added).

4.       As time was "running out," after the September 30, 2008 email, the LSE/SRA accelerated its campaign to destroy SM's law practice by utilizing witness statements Defendants Mayne and Lees obtained through fraud, bribery, and intimidation when traveling to California earlier in the year.  On October 3, 2008, the LSE/SRA initiated its witch-hunt by writing to SM and   making frivolous demands under the pretext of an audit.  On December 15, 2008, the campaign succeeded when the LSE/SRA raided his offices, with *Daily Mail* reporters and photographers on        hand.  In 2009 and 2010, PBW learned that the same persons orchestrating the attack on SM –     Defendants Middleton, Hegarty, and Mayne – had orchestrated the attack on him, an attack with        similarly predetermined conclusions.

5.       The LSE/SRA and Daily Mail attack was achieved through a "You scratch my back, I'll scratch your back" conspiracy by which the ANL/Daily Mail agreed not to publish negative articles about the LSE/SRA in return for the LSE/SRA intervening in SM's law practice which, in turn, was designed to destroy any libel claims brought by SM against the Daily Mail and also reward the Daily Mail by giving it the "scoop" on the intervention so its reporters and photographers could cover it.

6.       Various Defendants conducted or participated in the LSE/SRA Enterprise by sending agents into California, including Defendants Mayne and Lees, and by directing communications into California and other states as part of a pattern of racketeering activity,

including violations of 18 U.S.C. § 1512 (witness tampering); 18 U.S.C. § 1952 (Travel Act), 18 U.S.C. § 1343  (wire fraud); and various state statutes prohibiting witness bribery, influence, and intimidation. Defendant Gardner conducted or participated in the ANL/Daily Mail Enterprise in California through violations of 18 U.S.C. § 1343 (wire fraud).  The LSE/SRA and ANL/Daily Mail also constituted an associated-in-fact enterprise (a) with a common purpose; (b) with an ongoing organization; and (c) functioning as a continuing unit.

7.        Plaintiffs were harmed in their business and property as a result of one or more acts of racketeering activity.  Various Defendants, directly or indirectly, (A) acquired control over PBW's and SM's law practice enterprises through a pattern of racketeering activity in violation of § 1962(b); (B) conducted and participated in the conduct of LSE/SRA enterprise's affairs or the ANL/Daily Mail enterprise's affairs and/or the LSE/SRA-ANL/Daily Mail "associated-in-fact" enterprise's affairs through a pattern of racketeering activity in violation of 18U.S.C. § 1962(c); and (C) conspired to violate 18 U.S.C. § 1962(b) and/or § 1962(c) in violation of 18 U.S.C. § 1962(d) to        cause Plaintiffs' harm.

8.        SM also brings claims under the Computer Fraud and Abuse Act, 18U.S.C. § 1030, based on LSE/SRA illegally accessing his private educational records in the United States.

9.        Plaintiffs bring various non-federal claims arising from Defendants' misconduct.

## PARTIES

### PLAINTIFFS

10.        **Plaintiff Shahrokh Mireskandari** ("SM") is a citizen of the United States who previously practiced law in England as a solicitor.  He resides in California.  He is originally from Iran.  He is considered a minority in England.

11.        **Plaintiff Paul Baxendale-Walker** ("PBW") is a citizen of the United Kingdom who previously practiced law in England as a solicitor.  Although his last name is traditionally English, his birth parents were English and Brazilian.  He is considered a minority in England.

## DEFENDANTS AND RELATED PERSONS

12.     **Defendant Law Society of England and Wales ("LSE")** is a legal entity created in 1825 and recognized by Royal Charter in 1845. The LSE's internal divisions which it operates include the Office for Supervision of Solicitors ("OSS") (until 2004), Law Society Compliance Board (from 2005), and the Regulation Board (from 2006), and the Solicitors Regulation Authority ("SRA") (from January 31, 2007) which supervised the regulation of solicitors in England and Wales.

13.     **Defendant Solicitors Regulation Authority** ("SRA") is a constituent part of the LSE, which regulates and investigates solicitors and whose funding comes solely from solicitors' fees, not the Crown. The SRA succeeded the OSS in January 2007. As described in detail below, the SRA is a part of the LSE.

14.     **Defendant Lucy Moncrieff** ("Moncrieff") is the present President of LSE.

15.     **Defendant Des Hudson** ("Hudson") has since September 4, 2006, been the Chief Executive of LSE.

16.     Pursuant to the LSE General regulations (as modified from time to time) the President and Chief Executive of LSE have executive responsibility for the acts and omissions of SRA and its officers.

17.     **Defendant Legal Services Board** ("LSB") says of itself:[1]

"The Legal Services Board is a new organisation, created by the Legal Services Act 2007. The Board came into being on 1 January 2009 and became fully operational on 1 January 2010. Its overriding mandate is to ensure that regulation in the legal services sector is carried out in the public interest; and that the interests of consumers are placed at the heart of the system. The Board itself is responsible for overseeing legal regulators in England and Wales. It is independent of Government and of the legal profession. It oversees ten separate bodies, the Approved Regulators, which themselves regulate the lawyers practising throughout the jurisdiction."

18.     **Defendant Ministry of Justice** is a department of state of the British Crown. It has vicarious liability for the acts of agents and organs of the British State, for which it has oversight responsibility. As LSB says of this relationship: "The Legal Services Board (LSB) is accountable

---

[1]  http://www.legalservicesboard.org.uk/about_us/index.htm

1    to Parliament through the Lord Chancellor and is sponsored by the Ministry of Justice (MoJ)"

2        19.        Accordingly: the SRA is a sub-committee exercising the powers of LSE, which

3    powers are (subject to the votes from time to time of the LSE Council), exercised by the President

4    and Chief Executive of LSE; LSB has oversight responsibility for LSE; and LSB is accountable to

5    MOJ.

6
7        20.        **Defendant Barrington Mayne** ("Mayne") is a citizen of the United Kingdom and

8    a        former police officer who served as a lead investigator for the LSE/SRA and acted at the

9    direction of Defendants Middleton at all relevant times in regard to PBW and Defendants

10   Middletown and        Townsend at all relevant times in regard to SM.

11       21.        **Defendant Malcolm Lees** ("Lees") is a citizen of the United Kingdom and a

12   former    police officer who served as a lead investigator for the LSE/SRA and acted at the

13   direction of    Defendants Middleton and Townsend in regard to SM.

14       22.        **Defendant David Middleton** ("Middleton") is a citizen of the United Kingdom

15   and    from 2000 to 2007 was the Head of Investigation and Enforcement of the OSS and its

16   successors.        From March 2007 he has been the Executive Director of the SRA.  He directed

17   Defendants Mayne        and Lees and the actions by which Plaintiffs' legal practices were

18   destroyed.

19       23.        **Defendant Antony Townsend** ("Townsend") is a citizen of the United Kingdom

20   and served as the chief executive officer of the SRA at all relevant times.  He also directed

21   Defendants Mayne and Lees and the actions by which SM's legal practice was destroyed.

22       24.        **Defendant Richard Hegarty** ("Hegarty") is a citizen of the United Kingdom and

23   is a private solicitor who served as the "independent" member of the "Adjudication Panel," which

24   "rubber-stamped" approval of the investigation of PBW in November 2003 and the "Intervention"

25   (physical seizure) into the law practice enterprise of SM on December 15, 2008.

26       25.        **Defendant Patrick Rohrbach** ("Rohrbach") is a United States citizen and a

27   resident of the State of California and conspired with Defendants Mayne and Lees to provide false

28   witness statements to the LSE/SRA in return, upon information and belief, for bribes.  He then lied

     to cover-up his participation in the conspiracy in a telephone call in 2012.

26.        **Defendant The Solicitors Disciplinary Tribunal** ("SDT") is the purportedly independent board, which hears disciplinary complaints brought by the LSE/SRA (formerly the OSS and other predecessors) against solicitors. Persons who serve on its panels are solicitors and lay persons.

27.        **Defendant Anthony Hyman Isaacs** ("Isaacs") is a citizen of the United Kingdom who was the President of the SDT from 2000 to 2009 and who chaired a proceeding which, in knowing reliance upon illegally obtained evidence, disbarred PBW in 2006.

28.        **Geoffrey Negus** ("Negus") was the public relations director of the LSE/SRA who authored the September 30, 2008 email and was a conduit by which the LSE/SRA and ANL/Daily Mail communicated.

29.        **Defendant David Gardner** ("Gardner") is a citizen of the United States residing in        California who worked in California and was an agent of the *Daily Mail* and Associated Newspaper   Limited in illegally investigating SM and publishing false materials about him.

30.        **Defendant Joseph Scoma** ("Scoma") is a citizen of the United States residing in California who works in California and who created a fraudulent report and who illegally disclosed Plaintiff Mireskandari's confidential medical records.

31.        **Defendant Jennifer Coon** ("Coon")") is a citizen of the United States residing in California who works in California, and is a member of the California bar. Coon is a former associate of Bird. During 2012 to the present Coon represented Scoma. Coon was knowingly paid out of fiduciary funds belonging to the LSE/SRA, in the knowledge that there was no legitimate basis upon which such fiduciary funds could be used to pay her fees. Coon also coached Scoma in the giving of evidence on deposition.

32.        **Defendant Andrew Nicholas Pavlovic** ("Pavlovic") is a citizen of the United Kingdom and is a private solicitor, who instructed Scoma to prepare a fraudulent report, and who received the said illegally disclosed confidential medical records. Pavlovic at all material times worked as an associate at the English solicitors firm of Russell Cooke & Co. By reason of Middleton's instructions to Pavlovic to act in this way, and Middleton's actual knowledge of such instructions and acts, the SRA/LSE is vicariously liable for those acts. By reason of the LSE/SRA being an organ of the British State, the LSB and MOJ are further vicariously liable for those acts, and for the acts of Middleton.

33.      **Defendant Laurie Gilbert ("Gilbert")** is a citizen of the United States residing in California who works in California , and is a member of the California bar and who, while employed by Bird, illegally violated the Computer Fraud and Abuse Act (18 U.S.C. § 1030) so as to access confidential educational records of Plaintiff Mireskandari. She used her credit card to pay for such illegal records, and then delivered a copy to the LSE/SRA.

34.      **Defendant Bird Marella Boxer Wolpert Nessim Drooks & Lincenberg PC** ("Bird") is a   professional corporation based in Los Angeles. Its partner Mark T. Drooks represented LSE/SRA and the LSE Defendants with the actual knowledge that Gilbert had illegally acted as stated above. Bird has vicarious liability for the unlawful acts of Gilbert.

35.      **Does 1 to 100** are unknown to Plaintiffs who may have participated in the wrongful conduct alleged herein.

## JURISDICTION AND VENUE

36.      Federal question jurisdiction lies pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 18   U.S.C. § 1964(c) because this case arises under the laws of the United States based on claims for relief under RICO (18 U.S.C. § 1961 *et seq.*) and the Computer Fraud and Abuse Act (18 U.S.C. § 1030).

37.      Supplemental jurisdiction lies over the non-federal claims pursuant to 28 U.S.C. § 1367.

38.      Venue is proper under 18 U.S.C. § 1965 because Rohrbach and Gardner and Scoma and Gilbert and Bird and Coon are residents in this District and 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## SOVEREIGN IMMUNITY

39.      According to the ruling of His Honor Judge Bernal on May 14, 2013, the LSE/SRA (including the OSS and other predecessors of the SRA) are a political subdivision, agency, or instrumentality of the British Monarchy or Her Majesty's Government of the United Kingdom of Great Britain and Northern Ireland (the "Crown") subject to immunity pursuant to the Foreign Sovereign Immunity Act, 28 U.S.C. § 1602 *et. seq.* ("FSIA"):

*"The evidence establishes that LSE/SRA meets the "organ" criteria for FSIA immunity under Ninth Circuit precedent and congressional intent."*

40.      By reason of the matters pleaded above and below, the LSE/SRA Defendants' prima facie immunity under FSIA is abrogated by the tort and/or commercial statutory exceptions. Since Judge Bernal refused to permit any discovery whatsoever, the matter of tort and/or commercial exceptions was incapable of being litigated before him. His ruling accordingly did not create a res judicata estoppel as to that matter.

41.      It would reasonably have been expected that:

(1)      what even the Defendant Legal Services Board (which is the oversight regulator of LSE/SRA) says of itself is true:

"The Board itself is responsible for overseeing legal regulators in England and Wales. It is independent of Government and of the legal profession." and

(2)      in a Memorandum of Understanding dated May 21, 2010, to which the LSE was a party, it was truthfully stated that:

"3.1 The LSB [Legal Services Board] is responsible for overseeing legal regulators in England and Wales. It is independent of government and the legal profession. It oversees 10 separate bodies, the 'Approved regulators' . . ." (emphasis added); and "3.4 The Law Society is the professional body for solicitors in England and Wales. The Law Society represents solicitors' interests, including through negotiation and lobbying of the profession's regulators, Government and others." (emphasis added).

42.      It would further reasonably have been expected that Middleton would not have sought to contradict the UK government's own sworn position, as stated in European Commission of Human Rights case of X v. United Kingdom, 4 E.H.R.R. 350 (1982), in which the court found, based on the submission of the UK government, that the "Law Society had none of the immunities or privileges of the Crown: its servants were not civil servants, and its property was not Crown property. The Law Society was not an organ or part of the State."

43.     However, Middleton has yet again abused institutional sympathy for a regulator to obtain an interlocutory ruling which is contradictory to these stated truths.

44.     Accordingly, by cloaking his actions with a claim to sovereign immunity, for the purpose of avoiding discovery, and procuring the said interlocutory ruling from His Honor Judge Bernal, Middleton has "opened the door" to all of the Crown Defendants being sued. The Crown is indivisible.

45.     Since the avowed statutory purpose of the LSB is the "overseeing legal regulators in England and Wales", the LSB is vicariously liable for the acts of the LSE/SRA and has primary liability:

> (1)     It is not presently known, and will become known on discovery, if and to what extent the LSB had actual or constructive or other deemed knowledge of the pleaded misfeasance and misconduct by the LSE/SRA;
>
> (2)     If such knowledge is not shown to have existed, then the LSB has vicarious liability;
>
> (3)     If such knowledge is shown to have existed then the LSB, and its relevant individual officers (presently John Doe Defendants), each have primary liability.

46.     The like state of affairs now exists in relation to the Defendant MOJ.

47.     Since the LSE/SRA sovereign entity status has been affirmed by the ruling of His Honor Judge Bernal,  Defendants Mayne and Lees by definition violated the criminal law by entering into the United States without registering as sovereign agents in violation of 18 U.S.C. § 951. That violation carries penalty of an unlimited fine and/or imprisonment for up to 10 years. It is a RICO act.

48.     In any event, Mayne and Lees also committed RICO acts:

> (1)     In violation of Cal. Bus. & Prof. Code § 7521.5(c), failed to register as private investigators;
>
> (2)     In violation of Cal. Bus. & Prof. Code § 7583.39 failed to provide a bond;
>
> (3)     In violation of immigration and border control laws gave false information to   US immigration control in failing to declare their UK state agent

1   status, and in failing   to declare their intent to conduct investigative and/or

2   commercial and/or unlawful activity in the United States.

3   49.   Mayne and Lees committed a further RICO act in acting *ultra vires*.

4   English law does not permit the LSE/SRA to conduct investigations outside of England

5   and Wales, and indeed the territorial constraints on sovereign power entail that the

6   British parliament had not the constitutional power to grant to the LSE/SRA authority to

7   exercise its regulatory functions in the territory of another sovereign state.

8

9   50.   Middleton plainly knew of and directed these RICO act violations of Federal

10   and State law. He approved of them after the fact in a sworn declaration.

11   51.   The agreement between Middleton, Mayne, Lees (and such others as will

12   become evident upon discovery) to violate these said provisions of Federal and State criminal

13   law was itself a criminal conspiracy in violation of 18 USC § 371 - Conspiracy to commit

14   offense or to defraud United States, and a further RICO act.

15

16   ## FACTUAL ALLEGATIONS

17   **PAUL BAXENDALE-WALKER**

18   **PBW Is Targeted Based on His Success and Race**

19   52.   PBW was a well-known solicitor with expertise in taxation and trusts planning.  He

20   literally wrote the book on the subject, "The Law and Taxation of Remuneration Trusts" as well as

21   "Purpose Trusts."  As of 1999, he created efficient tax planning programs utilizing trusts for his

22   clients to minimize taxes in the United Kingdom.  His practice also included advising United

23   States citizens and corporations, and their intermediaries, on tax efficient inward investment into

24   the United Kingdom.

25   53.   In November 2000, PBW was charged with conspiracy to defraud in England by

26   the   Serious Fraud Office ("SFO") and was a defendant in related civil proceedings (the "Balfron

27   Matter").  The civil proceedings ended with PBW being exonerated by judgment dated April 17,

28

2002. On June 27, 2002, the Court ordered that a pending criminal prosecution against him be barred and the SFO was required to pay over $1 million of PBW's attorney fees.

### The 2000/2001 Retaliation

54.     In 2000, the LSE/OSS sensed that they could take advantage of the proceedings against PBW related to the Balfron Matter because they found his marketing of tax savings programs distasteful. In or about August 2001, a condition was placed on his practice simply because of the pending proceedings, even though he was entitled to the presumption of innocence, and, ultimately, the criminal proceedings were dismissed because of the April 17, 2002 judgment and June 27, 2002 order.

55.     In 2001, the LSE/OSS designed a new scheme to remove PBW as a solicitor. In or about May 2001, on the pretext of auditing the accounts of his practice, the LSE/OSS demanded PBW produce certain files. The audit was a fishing expedition to bring disciplinary proceedings against PBW, including proceedings alleging he was engaged in designing illegal tax schemes.

56.     In or around September 2002, the LSE/OSS, under the direction of Defendant Middleton, procured an internal report by Martyn Duerden. Duerden had no professional qualifications. Middleton then engaged the Deloitte accounting firm to prepare a "report" (the "Deloitte Report"). Middleton instructed Deloitte that their report would need to support Duerden's  report. Middleton supervised the writing of the Deloitte Report to ensure it reached the "right" result. Deloitte produced the Deloitte Report in or about May 2003, and the LSE/OSS produced its own "Forensic Report" in or about June 2003. Although the so-called "Forensic Report" was written by a mere investigator who had no understanding of English trust or tax law, it was signed by Michael Calvert,  the same person who signed later requests to investigate SM. Calvert's signature was designed to create the false impression that he had prepared the report rather than Duerden.

57.     Even though the LSE/OSS had been investigating PBW from May 2001, and the Deloitte Report had been in process from September 2002 through May 2003, on July 4, 2003, the LSE/OSS provided the report to PBW and demanded a response within 28 days. PBW issued claims against the LSE/OSS seeking judicial review and although the Court did not consider the merits based on procedural grounds, it concluded "it would seem fairly obvious . . . [PBW] . . . should be given a substantially longer period within which to respond." In or about September 2003, PBW submitted a substantive response.

### The Hegarty Star Chamber Part I:  The November 23, 2003 Resolution

58.     In or about November 2003, the matter was submitted to an "Adjudication Panel" for review. The ostensible role of the so-called "Adjudication Panel" is to provide independent review of the LSE/OSS reports as a means of protecting solicitors from unsubstantiated allegations and  investigations. Unbeknownst to PBW until 2010, the panel consisted of Defendant Hegarty, a solicitor in private practice, and a Mr. Stuart and Mr. Ball – both employees of the LSE/OSS being asked to "review" the recommendations of their boss, Defendant Middleton.

59.     On or about November 20, 2003, the Adjudication Panel allegedly met and concluded there were grounds to refer the matter to the SDT. Upon information and belief, the Adjudication Panel never met. Defendant Hegarty and the other members were mere "rubber stamps". More significantly, the Adjudication Panel imposed a condition on PBW, prohibiting him from providing legal advice to trusts – the core of his tax scheme practice. PBW was not informed of this decision until December 2003.

60.     PBW appealed, and in or about March 2004, a so-called "Review Panel" consisting of three members – all employees of the LSE/SRA – affirmed the restrictions in reliance on the Deloitte Report. The "Review Panel" prohibited PBW from advising trusts in or about March 2004 without even providing an oral hearing – most likely because they wanted to conceal they were not meeting (as later occurred with SM in December 2008). Again, this decision was a mere "rubber     stamp." The conditions were effective in three months.

### Master of the Rolls:  Part I

61.  PBW petitioned for appeal of the Adjudication Panel's decision to the Master of the Rolls (a Court judge) in December 2003 and amended his petition in April 2004 following the Review Panel's decision.

62.  Meanwhile, in June 2004, a conversation was recorded with the author of the Deloitte Report in which he offered to set up trusts that were identical to the trusts designed by PBW, which the Adjudication Panel and Review Panel found as grounds for discipline and placing conditions on his right to practice.  This offer revealed that the Deloitte Report criticizing PBW was a fraud, as evidenced by the Report's author offering to set up identical trusts.

63.  The hearing on PBW's appeal of the Review Panel's decision began in June 2004, and was adjourned to October 2004.  The Master of the Rolls stayed the imposition of the new conditions pending disclosure by the LSE/OSS.  Such disclosure revealed the fraudulent manner in which the Duerden/Deloitte Reports had been created.  Thus, in great embarrassment, the LSE/OSS abandoned these allegations in a Court hearing held in October 2004.

### The Retaliatory "Rule 4 Statement"

64.  On or about October 4, 2004, in retaliation for PBW exposing the Deloitte Report, the LSE/OSS served a "Rule 4 Statement" accusing PBW of misconduct and seeking disciplinary sanctions.  The Rule 4 Statement abandoned any allegations that PBW had been involved in advising illegal tax schemes, including the Deloitte Report – the very basis on which the Adjudication Panel and Review Panel rubber stamped the LSE/OSS requests for conditions.  Of course, in retaliation for PBW exposing the Deloitte Report, new pretextual allegations were made.

### The "Specially Convened Panel" Star Chamber

65.  In or about January 2005, PBW provided a response to the "Rule 4 Statement," and in or about February 2005, a so-called "Specially Convened Panel" again confirmed the conditions prohibiting PBW from representing trusts. Unbeknownst to PBW, the three members of the panel

were all employees of the LSE/SRA under the control of Defendant Middleton. PBW was again denied an oral hearing. Upon information and belief, the panel never met or deliberated. In any case, as admitted by Defendant Middleton in a secretly recorded 2009 conversation, the panel was a   mere "rubber stamp."

### Master of the Rolls:  Part II

66.        In or about June 2005, PBW was again before the Master of the Rolls, but the hearing was adjourned until July 2005. Ultimately, the Court deferred to the decisions of the Adjudication Panel, Review Panel, and Specially Convened Panel (not knowing they were mere "rubber stamps") and affirmed the condition that PBW could not advise companies in involved in tax schemes. This decision, obtained by the LSE/OSS's fraudulent concealment that the panels were mere "rubber stamps" under the control of Defendants Middleton and intimidation of witnesses who could have assisted PBW, essentially destroyed PBW's tax advisory practice.

### The Isle of Man Fraud

67.        In order to establish a case against PBW, the LSE/SRA, under the orders of Middleton, engaged in a fraudulent scheme to deceive the Attorney General of the Isle of Man by pretending it  was conducting a criminal investigation in order to obtain confidential documents and by falsely claiming PBW was being prosecuted for fraud (after that case had already been dismissed due to the High Court's finding of innocence). From March 2002 through July 2005, Defendant Mayne, under the direction of Defendant Middleton, sent deceitful and false correspondence to the Attorney General alleging the documents were needed for a criminal investigation knowing they had no authority to conduct such an investigation. The documents sought and obtained by the LSE/SRA included PBW's privileged correspondence with clients, including documents related to California residents Neuronetics, Inc. and Nicholas Pinkowski. Ultimately, the Attorney General discovered Defendants Middleton and Mayne had deceived him and refused any further cooperation in 2005.

## THE DEFAMATORY STATEMENTS DESIGNED TO PRESSURE PBW INTO SUBMISSION AND PREVENT HIM FROM OBTAINING WITNESSES

68.     One of LSE/SRA's tactics (through investigator Mayne and Lees) is to spread false rumors to clients of solicitors in order to induce them to disassociate themselves from the solicitors        and not pay their outstanding bills, with the intent to cut off the solicitors' revenue and ultimately        destroy their law practices. Defendants Mayne's and Lees' *modus operandi* is to deceive, intimidate, and/or bribe witnesses in order to procure false witness statements and to deter them from cooperating  with solicitors under investigation.  This conduct was orchestrated and implemented by Defendant Middleton against PBW.

### Nicholas Pinkowski

69.     Nicholas Pinkowski ("Pinkowski") was a United States citizen and a resident of California and a client of PBW in 2004.

70.     Pinkowski stated that in 2004, Defendant Mayne called him in California. Defendant Mayne stated his office was involved in prosecuting PBW for criminal offenses involving tax fraud.  Defendant Mayne said that his office had uncovered evidence that £750 million of funds had been illegally put outside the UK by PBW, and the UK tax authorities were very concerned.  Defendant Mayne said PBW was "obviously a criminal" and "bad news" to know and that "the British government would be very grateful for any assistance I could give them." Defendant Mayne further said that "the British government would be willing to pay compensation for my time and trouble and that they would find me another US lawyer who could look after me, if I helped them in relation to PBW."

71.     Pinkowski stated: "This conversation obviously gave me cause for concern.  While I    valued PBW's expert advice, I did not want to become involved in the issues raised by Defendant        Mayne.  I called PBW's office and left a message cancelling his retainer."

72.     Pinkowski had been in the process of arranging introductions for PBW to different business associates and friends.  Between them, they represented potentially millions of dollars of business for PBW.  After Mayne's telephone call, Pinkowski let those arrangements lapse, as he did    not want to expose those associates and friends to someone who was "obviously a criminal," as Mayne had said.

73.     In 2005, PBW attempted to contact Pinkowski to determine if he might be a witness    on his behalf.  Pinkowski refused to speak to PBW because of Defendant Mayne's accusations.

### Alidad Mireskandari

74.     Alidad Mireskandari ("Alidad") is a United States citizen, a resident of New Jersey,    and worked in New York.  He had a professional business relationship with PBW and also introduced clients to PBW.  He is the brother of SM.

75.     Alidad was contacted by telephone by Defendant Mayne in New York in 2004. Defendant Mayne stated he was an investigator working for the British government and involved in ongoing prosecution of PBW for criminal offenses involving tax fraud.  Defendant Mayne said his    office had uncovered evidence that over £750 million of funds had been illegally put outside the UK by PBW and that the UK tax authorities were very concerned.

76.     Defendant Mayne stated to Alidad that PBW was "clearly a criminal" and "bad news" to know and that "the British government would be very grateful for any assistance I could give them."  Defendant Mayne said that "the British government would be willing to pay me compensation for my time and trouble and that they would find me another US lawyer who could look after me, if I helped them in relation to PBW."  He said that Alidad must "on no account" tell PBW about it or this could "put me in serious trouble with the British authorities."  "I called or emailed PBW's office cancelling my retainer."

77.     As a result of Defendant Mayne's telephone call, Alidad ceased his professional business relationship with PBW.

78.     Thereafter, Alidad reported his conversation to Mehran Tamami.

79.     In 2005, PBW attempted to contact Alidad to be a witness on his behalf.  Alidad refused to speak to PBW because of Defendant Mayne's accusations.

80.     PBW only learned of Defendant Mayne's statement to Alidad in 2011.

### Mehran Tamami

81.     Mehran Tamami ("Tamami") is a United States citizen and resident of Washington,     D.C. He had a professional business relationship with PBW.

82.     Defendant Mayne contacted Tamami by telephone in Washington, D.C. in 2004. Defendant Mayne made the same false accusations to Tamami as he made to Alidad.  As a result of Defendant Mayne's telephone call, he ceased his business relationship with PBW.

### The Sham 2004 Case

83.     Having abandoned the claims of misconduct regarding alleged tax fraud, the LSE/OSS initiated the October 2004 "Rule 4 Statement" case alleging, *inter alia*, PBW engaged in conflicts of interest among his clients and his firm. PBW opposed the LSE/OSS although, for all intents and purposes, his tax practice was substantially destroyed when the Master of the Rolls upheld the conditions in 15 July 2005.

84.     In the first phase of hearings, in or about April 2005, the SDT found that the LSE/OSS's allegations regarding the Balfron Matter were unsubstantiated and found against PBW regarding his writing a recommendation letter for a person whom he did not know in 1994.  PBW was suspended for three years – a draconian penalty designed to punish him for fighting back and exposing the Deloitte Report and dishonest conduct of Defendant Middleton related to its drafting, on a matter which had been investigated by the LSE/OSS in 1994 and deemed insufficient to bring disciplinary action.

85.     In the second phase of hearings, in or about September 2006, the SDT, in a proceeding chaired by Isaacs, found PBW engaged in conflicts of interest regarding his trust

1   advice and dishonestly removed him as a solicitor in circumstances where not a single client ever

2   complained about this conduct.

### SHAHROKH MIRESKANDARI

4   86.        SM was born in Iran, emigrated to the United States in 1981, and became an

5   American citizen in 1990

6   87.        From 1989 through 1995, he worked as a paralegal.  In 1995, he went to work for

7   attorney William L. O'Bryan ("O'Bryan").  O'Bryan wrote various references for SM.  SM

8   received his undergraduate degree from National University in California and graduated from the

9   American University of Hawaii law school ("AUH") in 1997.  SM then attended London

10  Guildhall University Law School in London in 1998.

12  88.        From 1999 to 2000, SM completed his solicitor's apprenticeship, including

13  successfully completing his courses and exams, and qualified as a solicitor in 2000.  From

14  2000 to 2005, SM worked as a solicitor.  Then, in 2005, SM became a salaried partner, and,

15  by 2006, SM became the managing partner of the Dean & Dean firm, with over 40 solicitors

16  and staff, mostly of black, minority, or ethnic origin ("BME").

### SM'S ANTI-RACISM CAMPAIGN

18  89.        SM became aware of the LSE/SRA's racist conduct and targeting of BME

19  solicitors.  The LSE/SRA dishonestly audited Dean & Dean and SM (when SM was not even a

20  partner), in an 18-month investigation in 2003 and 2004 (at a time when they were after PBW).

21  No wrongdoing was found.  SM's personal experience caused him to reach out to other BME

22  solicitors who had also been victims of similar racist and discriminatory conduct of the LSE/SRA.

24  90.        In August 2007, SM wrote to Keith Vaz, a Member of Parliament ("MP"),

25  describing the problems experienced by BME solicitors at the hands of the LSE/SRA.  In October

26  2007, MP Vaz summoned Defendant Townsend to a meeting at the House of Parliament at which

27  SM and other BME solicitors confronted Defendant Townsend regarding the racist targeting of

28  MBE solicitors. MP Vaz later raised this during Parliamentary debate, and, as a result, Lord

Herman Ouseley was appointed to conduct an internal review relating to allegations of discriminatory racist practices of the LSE/SRA towards BME solicitors. In July 2008, the Ouseley Report was published and made scathing findings regarding racism in the LSE/SRA.

91.     Meanwhile, SM represented Tarique Ghaffur in a racial discrimination claim against the London Metropolitan Police and its Commissioner, Sir Ian Blair. Ghaffur, Britain's most senior Asian police officer, received a landmark settlement. Blair thereafter resigned. Coincidentally, Blair's attorney Ed Solomon was at that time on the board of the SRA and was friends with Defendants Townsend and Middleton. SM also represented many members of the National Black Police Association in race discrimination claims against the Metropolitan Police.

92.     SM filed his own claim against the LSE/SRA for racial discrimination in May 2008.

**THE LSE/SRA'S RETALIATION**

93.     SM's ground-breaking legal actions on behalf of BME individuals against the LSE/SRA and Metropolitan Police did not go unnoticed. In retaliation, the LSE/SRA and *Daily Mail*, a notoriously racist tabloid, began a campaign against him. These articles included references to information, which only could have been learned from leaks by the LSE/SRA, including knowledge of the impending "Intervention." The *Daily Mail*'s first article on SM appeared on the front page on September 11, 2008, including a cartoon portraying him as a member of the Taliban. The date of the article was hardly a coincidence.

94.     Tellingly, on September 30, 2008, just after Defendant Townsend was forced to respond to the damning conclusions of the Ouseley Report, a LSE/SRA internal email to Defendant Townsend, on which Defendant Middleton and the LSE/SRA outside media advisors were copied,    stated:

> Steve Wright, the reporter who's been driving the *Daily Mail's* reporting of Mireskandari, Dizaei and Vaz, has called me several times during the past few weeks asking what we are going do to about

Mireskandari . . . Wright now says his patience with us is running out. He is amazed that we have not stopped Mireskandari from practicing long before now . . . Wright has a bullying manner, even by the standards of crime reporters.  Of course, it could all be bluster – though given what he has managed to publish during the past month, I wouldn't care to call his bluff.  One reason for cajoling us is that action against Mireskandari by the SRA might strengthen the hand of Associated Newspaper in any libel proceedings . . . However, I too am beginning to wonder how long it has to take us to deal with Mireskandari.  On several occasions since October 2007 we have been told that he is being treated as 'top priority'.  If the *Mail* really is able to clobber the SRA, it would probably want to run the story as a front-page lead.  Currently the economic crisis is providing better material, but that won't go on for ever.  I will continue dealing with Wright as I have been.  But I sense that the *Mail* does have material that would damage the SRA, and that time is running out.

*See* Exhibit A (emphasis added).

95.      In fact, as the email revealed, the LSE/SRA had been planning no later than the October 2007 confrontation at the meeting convened by MP Vaz which exposed racism in the LSE/SRA to retaliate against SM; now, the *Daily Mail*'s threat to "clobber the SRA" pushed their hand into immediate action to get SM to avoid "time . . . running out."  And, incredibly, this email disclosed the LSE/SRA's investigation of SM to their outside media advisors.  Just days later, the October 3, 2008 document demand, described below, accelerated the process of destroying SM.

**THE CORRUPTED INVESTIGATION IN CALIFORNIA**

96.     In 2008, Defendants Mayne and Lees, under the direction and orders of Defendants Middleton and Townsend, traveled to California on at least three separate occasions intending to violate U.S. law under the pretext of "investigating" SM.

**William O'Bryan**

97.     William O'Bryan ("O'Bryan") is a citizen of the United States and an attorney residing in California who formerly employed SM.

98.     During the three separate trips of April, July, and September 2008, Defendants Mayne and Lees traveled to California and met with O'Bryan in Los Angeles.  They obtained O'Bryan's cooperation by intimidating him and falsely alleging

>          (1) they were closely tied to criminal prosecution authorities;

>          (2) SM was under investigation for serious criminal offenses, including

>          bribing a judge, and would likely be going to prison in the UK soon;

>          (3) SM had a felony record in California;

>          (4) the United Kingdom government would appreciate his cooperation;

>          and (5) O'Bryan should distance himself from SM.

99.     By lying to and pressuring O'Bryan, Defendants Mayne and Lees obtained witness statements from him.  These witness statements contained many false allegations.  Defendants Mayne and Lees used the wires, i.e., telephone and emails, to obtain the witness statements from O'Bryan from April to September 2008, and transmit them to the UK.  Upon information and belief, Defendants Mayne and Lees paid, or offered to pay, remuneration to O'Bryan in return for his cooperation in light of their offering to pay other witnesses.

100.    The LSE/SRA relied on O'Bryan's witness statements in intervening in SM's practice on or about December 15, 2008.  In December 2008, after the Intervention, O'Bryan disavowed the statements which Defendants Mayne and Lees intimidated him into giving.

## Lawrence Greenbaum

101.    Lawrence Greenbaum ("Greenbaum") is a United States citizen and an attorney residing in California who, along with Howard Schechter, represented SM in a proceeding in Ventura Superior Court to which SM pled *nolo contendre* to misdemeanor charges, which were expunged.  Greenbaum also employed SM as a paralegal.

102.    In April 2008, Defendants Mayne and Lees repeatedly telephoned Greenbaum from      the UK and California and asked to interview him.  Greenbaum refused to discuss SM or meet      because of the attorney-client privilege. Nonetheless, in April 2008, Defendants Mayne and Lees      traveled to California and visited Greenbaum's office, repeatedly telephoning him from the lobby of his office building.

103.    Anthony Baron, Greenbaum's assistant, came down to meet them. They falsely represented they were from the prosecutor's office in England and were inquiring into a criminal investigation.  Defendant Mayne offered a bribe by stating that they would be "willing to pay a considerable amount of money" to Greenbaum for his time and showed Baron a wad of cash.  Then, in November 2008, Defendant Lees sent a telefax to Greenbaum, falsely stating that Greenbaum had informed him that he had refused to meet with them because Greenbaum was intimidated by SM. The statement in the letter was false and Greenbaum responded to Lees, stating he was appalled with Lees' lying.

## Defendant Patrick Rohrbach

104.    In July 2008, Defendants Mayne and Lees met with Defendant Rohrbach in California and falsely alleged they were associated with prosecutors in England.  Defendant Rohrbach supervised the "Moral Character Unit" of the California State Bar.  Defendant Rohrbach provided Mayne and Lees with three witness statements, one of which falsely and dishonestly attested that SM  have violated California law by improperly practicing as an attorney and would be prosecuted if he had done so.  Upon information and belief, Defendant Rohrbach did not receive approval of his superiors in signing these statements; Defendant Rohrbach is not an

attorney and does not have the qualifications to issue such statements. In effect, Defendant Rohrbach was providing legal advice even though he was not an attorney.

105.      Upon information and belief, Defendant Rohrbach was bribed to issue the statements he did because there is no reason that he would have provided these statements in his official capacity, and, further, Rohrbach was apparently under financial pressure, as evidenced by his eventual bankruptcy in 2009 after giving the three statements.

106.      In 2012, in a telephone call with SM's California attorney (and London counsel), Defendant Rohrbach stated that he had never heard of Defendant SRA, had never heard of or met Defendants Mayne and Lees, and denied signing such statements. This was a lie and designed to cover up his misconduct.

107.      The LSE/SRA relied on Defendant Rohrbach's statements in intervening in SM's practice on or about December 15, 2008.

### Melody Norris

108.      In November 2008, SM obtained a witness statement from Melody Norris, a United    States citizen and California resident, who worked with SM and O'Bryan as a paralegal. This       statement was served on the LSE/SRA on June 29, 2009.

109.      In early July 2009, Defendant Mayne called Norris and falsely represented that he worked for the prosecutor's office in England. Defendant Mayne falsely stated SM was under investigation for taking monies from clients and bribing judges. Defendant Mayne further falsely stated SM's arrest was imminent. Defendant Mayne threatened her with serious repercussions if she assisted SM and came to England to give evidence. Defendant Mayne falsely asserted that the British government would appreciate her cooperation and offered to pay her $5,000 if she were to withdraw her witness statement. She refused.

**Howard Schechter**

110.　　　Howard Schechter ("Schechter") is a United States citizen, an attorney, and California resident who represented SM in the Ventura County matter and thereafter employed SM.

111.　　　Defendant Mayne telephoned Schechter and then both Defendants Mayne and Lees traveled to meet Schechter at his home in Malibu, California in 2008.  They asked Schechter to serve as their agent to telephone Greenbaum to convince him to meet with them.  Schechter telephoned Greenbaum many times to convince him but to no avail.  Defendants Mayne and Lees offered financial inducements to Schechter, including first class air tickets and hotel accommodations for Schechter and his wife to London, if he would divulge attorney-client privileged information.  Thereafter, the *Daily Mail* contacted Schechter and obtained confidential information from him, which appeared in a *Daily Mail* article published on September 11, 2008.

## THE COMPUTER FRAUD IN VIOLATION OF 18 U.S.C. § 1030

112.　　　As part of the effort to obtain confidential information on SM as a pretext for intervening in his practice, the LSE/SRA instructed Bird to illegally access the National Student Clearinghouse website to obtain SM's educational records. Bird instructed its employee Gilbert to carry out this illegal activity.  In order to access such records at such time, the requester was required to "check a box" on the webpage that she was　　　entitled to make the request.  SM never authorized the request and none of Bird, Gilbert nor was the LSE/SRA otherwise entitled to make the request. Thus, Gilbert and Bird and the LSE/SRA　　　fraudulently accessed SM's records in violation of 18 U.S.C. §

113.　　　Gilbert used her own credit card to pay the fee charged by National Student Clearinghouse for sending a copy of such illegally obtained records to her. She obtained reimbursement of such sum from Bird. Bird included such sum in its billings to LSA/SRA. It also included billing for her time in conducting the said fraud. LSE/SRA paid such billed sums. LSE/SRA had no authority to use

1   public money held in trust for the solicitors profession to discharge expenses incurred in defrauding

2   National Student Clearinghouse, and in the criminal act of violating 18 U.S.C. §.

3   114.        Gardner did the same similarly violated 18 U.S.C. §.

**HAWAII**

4

5   115.        SM graduated from the American University of Hawaii in 1997.

6   116.        Jeffrey Brunton was – until his death in August 2012 – a lawyer for the State of

7   Hawaii, Office of Consumer Protection, who headed several lawsuits related to unaccredited

8   colleges and graduate schools in Hawaii, including the American University of Hawaii.

9

10  117.        Defendants Mayne and Lees devised a scheme to go to Hawaii with the intent to

11  meet with and deceive Brunton in order to access SM's confidential records. In or around July

12  2008, Defendants Mayne and Lees traveled from California to Hawaii. According to a statement

13  made by Brunton, they falsely told him that they were investigators working for British

14  government prosecutors. They asked Brunton questions about SM and accessed documents. On

15  information and belief, Mayne and Lees transmitted that information to the UK hoping that it

16  would support the destruction of SM's practice and supplied such information to the *Daily Mail*.

17  However, because it was beneficial to SM and detrimental to the LSE/SRA's agenda, such

18  information was never used.

**VIRGINIA**

19

20  118.        Defendant Rahnema is a former client of SM who owed £800,000 (approximately

21  $1.2 million in 2008) pursuant to an English judgment. In August 2008, Rahnema's wife

22  informed      SM that Defendant Rahnema informed her in Virginia that a representative of the

23  SRA instructed him not to pay the judgment because the LSE/SRA planned to close down SM's

24  law practice shortly; this was highly confidential information. The instruction by the LSE/SRA to

25

26  Defendant Rahnema not to pay the £800,000 was a means of bribing him to obtain his cooperation

27  in the investigation. In addition, the SRA was seeking to cut off SM's income so that it could

28  allege he was under financial pressure to justify the "Intervention."

119.      Later, in April to May 2012, Rahnema telephoned and then sent an email to SM's doctor in California, defaming SM. The email threatened that if SM's doctor did not cease providing evidence and medical service to SM, Rahnema would file a complaint against him to have his license removed. The email referred to confidential medical information about SM which only could have been learned from the LSE/SRA. Upon information and belief, Rahnema was acting as the agent of the LSE/SRA to intimidate SM's doctor from providing evidence in return for the LSE/SRA intervening in SM's practice so that Rahnema did not have to pay the judgment. Rahnema also threatened bodily harm to SM by threatening to shoot him, as described below.

## THE INTERVENTION DESTROYING MIRESKANDARI'S BUSINESS

120.      In retaliation for SM's exposure of racism in the LSE/SRA resulting in the Ouseley Report, as well as filing his own racial discrimination claims against the LSE/SRA and defeating the London Metropolitan Police in racism claims, and in fear of the threats of the *Daily Mail*, the LSE/SRA implemented its vindictive campaign to destroy SM because time was "running out" as set forth in the internal LSE/SRA September 30, 2008 email.

### The October 3, 2008 Letter

121.      Immediately after the September 30, 2008 internal LSE/SRA email, on or about October 3, 2008, the LSE/SRA sent a letter to SM demanding information regarding his educational and work background, providing him 21 days to respond. This letter was initiated to accelerate the scheme to later bring false disciplinary proceedings against him, based on false information obtained by Defendants Mayne and Lees from Defendant Rohrbach and O'Bryan. However, in light of the pressure from the *Daily Mail*, the LSE/SRA did not even give 21 days to SM to respond to this letter.

### The October 5 Pretextual Notice

122.      On or about October 5, 2008, the LSE/SRA sent a letter and made demands that SM immediately produce documents related to alleged misconduct regarding three clients. The letter also requested information regarding his educational and work background. LSE/SRA

personnel came to his office to obtain such documents that same day. This letter was the next step in the scheme to bring false disciplinary proceedings against SM based on the false information obtained by Defendants Mayne and Lees from Defendant Rohrbach and O'Bryan.

123.     SM applied to Court and obtained an order staying proceedings. Ultimately, in November 2008, the Court denied the stay motion based on false evidence Defendants Mayne and Lees obtained from Rohrbach and O'Bryan. At this point in time, however, SM did not know of the fraudulent conduct of Defendants Mayne and Lees. In addition, the September 30, 2008 email regarding the *Daily Mail* was not discovered by SM until March 2011.

### Hegarty Star Chamber Part II: The December 12, 2008 Resolution

124.     By December 12, 2008, the LSE/SRA's plan to destroy SM's legal practice reached fruition.

125.     On December 12, 2008, the LSE/SRA submitted a request to an Adjudication Panel headed by Defendant Hegarty, along with two LSE/SRA employees, in the form of an 800-page report. The Panel allegedly conferred by telephone and rubber stamped the request to intervene in SM's practice. The documents provided to the Panel included the false Defendant Rohrbach and O'Bryan statements.

126.     Upon information and belief, although Defendant Hegarty was a loyal soldier and prepared to only cursorily review the materials and rubber stamp almost anything requested by the LSE/SRA, he would not have approved the Intervention if he knew the Defendant Rohrbach and O'Bryan statements were procured by bribery and/or fraud, although, of course, he was prepared to conceal he was a mere "rubber stamp."

### The December 15, 2008 Intervention

127.     On December 15, 2008, the LSE/SRA intervened in SM's practice by sending an army of solicitors, investigators, and other personnel to physically seize his office and files.

Although intervention is supposed to be confidential, *Daily Mail* photographers and reporters were camped outside SM's office when they arrived. The intervention was immediately reported by the *Daily Mail* in its online version and in print – the *coup de grace* to SM's law practice.

128.     Although SM attempted to have the intervention set aside and initially participated in the subsequent SDT proceedings, the harm was done through the use of the Defendant Rohrbach and O'Bryan statements. His practice was destroyed regardless. Not surprisingly, the SDT ultimately ordered SM be disbarred in 2012 after continuing proceedings in which he could not appear because of serious physical illness documented by his California doctors.

### The 2009 Recorded Telephone Conversations With Defendants Middleton and Isaacs

129.     The pleadings in this sub-part are advanced and relied upon by Plaintiff Mireskandari only. In 2009-2010, PBW conducted an "investigation of the investigators" using various pseudonyms and legally tape recording conversations, in the belief that they were dishonest and corrupt. PBW did not and could not know in advance what they would say, or whether they would talk to him at all. Immediately upon having the conversations, PBW reported them to his English solicitors with instructions to ascertain if their content rendered Middleton and/or Isaacs liable for contempt proceedings.

130.     In a recorded telephone conversation in 2009, Defendant Middleton admitted the purported independent "Adjudication Panels," which were supposed to protect solicitors, were mere "rubber stamps." Middleton also admitted that members of the SDT – the purportedly independent body which decides cases against solicitors – were secretly supportive of any cases brought by the SRA.

131.     In another recorded telephone conversation in 2009, Isaacs admitted the proceedings against PBW were a "foregone conclusion" because the SRA had determined he was "a rogue who had to be got rid of." He admitted in a later conversation he was "acting as a matter of policy with complete bias in favor of the Law Society in [the PBW] matter and all other matters" and "this policy was acted on by all members of the Tribunal."

132.     In another recorded telephone conversation in 2010, Defendant Hegarty admitted that "on average we were doing probably 10 or 12 cases a day" and the Panel takes "the Recommendations . . . through a process towards what's effectively been decided beforehand," and

"you couldn't in all honesty claim there was any real independence of the SDT from the SRA" and

"during the Isaacs era of some 8 years or so, there grew to be a symbiosis between Anthony [Isaacs]'s agenda of robust support for the Law Society and the SRA agenda very much set by David Middleton" and "that sort of symbiotic support was bound to affect the integrity of the whole SRA/SDT process."

## THE LSE/SRA UTILIZED 28 U.S.C. § 1782 TO OBTAIN *EX PARTE* DISCOVERY IN CALIFORNIA, WASHINGTON, D.C., AND VIRGINIA

133.     On May 6, 2009, the LSE filed an *ex parte* application in the United States District Court for the District of Columbia to serve subpoenas upon The George Washington University to obtain educational records of SM.  The application was granted.

134.     On May 7, 2009, the LSE filed an *ex parte* application in the United States District Court for the Eastern District of Virginia to serve subpoenas upon Northern Virginia Community College to obtain educational records of SM.  The application was granted on May 26, 2009.

135.     On May 7, 2009, the LSE filed an *ex parte* application in the United States District Court for the Central District of California to serve subpoenas upon the University of West Los Angeles and Whittier Law School to obtain educational records of SM.  The application was granted on May 12, 2009.

136.     Each of the above applications referenced witness statements from Defendant

Rohrbach and O'Bryan as evidence, which were obtained in violation of 18 U.S.C. § 1512, the proscription against witness tampering.

137.    The LSE/SRA would have used the wires in speaking by telephone and sending documents by email to their counsel in the United States in the preparation and filing of these applications.

138.    The LSE/SRA's counsel would have used the wires in filing these applications.

## THE SECRET COMMUNICATIONS WITH DR. SCOMA

139.    In April, 2012, SM was seriously ill and sought an adjournment of the proceedings before the SDT. He submitted compelling medical evidence of his illness, inability to travel to England, and inability to participate in the proceedings from several California physicians.

140.    In response, the LSE/SRA sought the appointment of an allegedly independent medical expert, Scoma of California. The SDT appointed Dr. Scoma as its independent expert (not the expert of the LSE/SRA) and instructed Russell Cooke to instruct Scoma, which Russell Cooke did through Defendant Pavlovic. Pavlovic qualified as a solicitor on September 1, 2010. He had, by 2012, sufficient professional experience to appreciate the manifest conflict of interest arising from him seeking to act on sole behalf of the SDT in instructing its expert, and in acting generally as advocate in the partisan interests of the LSE/SRA. He did in fact act at all times with utter disregard to his fundamental duty as a solicitor, and to his specific duty to the SDT.

141.    Defendant Pavlovic sent Scoma a letter of instruction by email on April 20, 2012.

142.    The letter of instruction was an improper attempt to prejudice Scoma against SM. It referred to "alleged breaches" involving "honesty, probity, trustworthiness independence and integrity." It was irrelevant for Scoma to know the nature of the proceedings; he was merely a medical expert.

143.     Further, the letter attached a schedule with instructions that were not approved by the SDT. These included instructions that Scoma "let us see a copy of your answers before finalizing them" in regard to any questions submitted by SM and "[i]f you inform us that you do have an actual or potential conflict of interest, we may decide that we do not consider that it affects your independence as an expert and we do not need to withdraw your instructions." The LSE/SRA had no right to preview Dr. Scoma's answers or decide whether he was conflicted.

144.     The scheduled also stated: "Please direct any communications on this matter to this firm and mark any correspondence or other documents as confidential and privileged and prepared at the request of Russell-Cooke LLP for the purpose of litigation." This created the false impression that Scoma was acting on behalf of the LSE/SRA. As subsequently testified by Scoma, that was his belief.

145.     Unbeknownst to SM, the LSE/SRA, through Pavlovic, then engaged in a campaign of concealed  communications with  Scoma to influence his purportedly independent report. These numerous *ex parte* emails to Scoma, included, *inter alia*:

146.     As a result of the instruction to communicate with the LSE/SRA (but not SM), on April 25, 2012 12:11, Scoma sent an email to Pavlovic stating: "I believe I can assist you in this matter as an expert general and colorectal surgeon.  I expect that all the medical records will be forwarded to me for a thorough review.  at this point I do not intend to examine the patient. … also I should have a clear understanding as to whom i am responding."

147.     Pavlovic and the LSE/SRA concealed his intent not to examine SM from SM.

148.     On April 26, 2012, 10:21 an email from the Pavlovic to Scoma, stated "Thank you for your e-mail. In terms of further communications please address these to me. … If you have any remaining queries then do not hesitate to contact to contact me."     This again created the false impression Scoma was reporting to the LSE/SRA.

149.      On May 22, 2012, 12:54, SM's treating physician, Michael Farzam, emailed Scoma

stating "I have arranged a medical facility in Los Angeles for the purposes of your examination of Mr. Mireskandari. The patient is ready and available for the evaluation at any time. If arriving by car, I can arrange for directions and parking. If arriving by air, we can make arrangements for your pickup. If there is anything else that you specifically require, please let me know. I look forward to hearing from you urgently."

150.      On May 23, 2012, 16:54, Scoma emailed Pavlovic stating: "I have received late last evening a comprehensive medical package from dr farzam. this package contains the medical records concerning mr mireskandari's colorectal history. i plan on writing my report based on this information and will try and email it to you today or tomorrow. you can then forward it to the appropriate authority. I have no intention to perform an actual physical exam. i hope that this will be satisfactory and i may move towards closure" Pavlovic and the LSE/SRA concealed Scoma's continued intention not to examine SM from SM.

151. On May 23, 2012, Scoma emailed his report to Pavlovic, only stating SM "should be able to travel to London at any time." Scoma's report contained no "view" regarding SM's ability to instruct legal representatives, prepare for, or attend and participate in the hearing set to commence on May 28, 2012.

152.      On May 24, 2012, 11:52, Pavlovic on the instructions of Middleton emailed Scoma stating: "For completeness, it would be very helpful if you were able to confirm your view as to whether Dr. Mireskandari is able to instruct legal representatives, prepare for, attend and participate in the hearing due to commence on 28 May 2012." This email and the LSE/SRA's ham-handed attempt to get Scoma to adjust his report to its liking was concealed from SM.

153.      On May 24, 2012, 17:34, Scoma emailed his revised report to Pavlovic, adding the requested language stating: "I am able to confirm, and it is my opinion that Dr. Mireskandari is able

to instruct legal representatives, prepare for, attend, and participate in the hearing due to commence

on May 28, 2012. I see no reason why he is unable to travel by plane from the USA to the UK." Pavlovic and the LSE/SRA produced this report while concealing how it was developed.

154.    On June 8, 2012 Scoma emailed Pavlovic stating "I assume that the matter that i assisted you with has been completed successfully. I hope that my report was beneficial. My invoice was previously. Forwarded to you. Prompt payment would be very much appreciated." This email reflected how Pavlovic and the LSE/SRA fraudulently induced Scoma to believe he was acting for the LSE/SRA.

155.    On June 11, 2012, emailed Pavlovic Scoma various documents, including letters and medical reports from SM's physicians, asking for comments/clarifications to his initial report. The

SDT never authorized Russell Cooke to request a supplemental report. This was concealed from SM.

156.    On June 12, 2012, 1:06 email, Scoma sent an email to Pavlovic, stating: "i will review the seven statements letter and reports as soon as possible. i do not plan on changing my report of May 23rd 2012 and perhaps write a confirmation of my opinion to the SDT." Pavlovic and the LSE/SRA concealed that Scoma had prejudged the issue and had decided not to revise his report without even reading these materials.

157.    On June 12, 2012, 13:27, the Pavlovic emailed Scoma asking him to comment on the

two reports of Dr. Sokol, SM's physician, and to state to what regard his conclusions are amended. Pavlovic and the LSE/SRA concealed they were making this request.

158.    On June 12, 2012, 23:27, Scoma submitted an addendum to his May 23, 2012 report, stating his "opinion and report remain the same." This is not surprising, given the LSE/SRA's efforts to induce Scoma to believe he was acting for the LSE/SRA.

159.    On June 21, 2012, 23:25, Scoma emailed Pavlovic stating "I hope that all went well for you and your firm." This email, showing that Scoma believed he was assisting the LSE/SRA and its solicitors, was concealed.

160.    Not surprisingly, when SM, through his barrister, discovered some of the *ex parte* communications (the June 8, 2012 and June 21, 2012 emails were only discovered after the SDT rendered its final decision on June 21, 2012), the SDT simply ignored them, even though *ex parte* communications with experts are not permitted under English law and is a gross violation of due process. The SDT explicitly relied on Scoma's opinion in reaching this decision. As a result, the remainder of the proceeding was conducted without SM's participation.

161.    In fact, as subsequently testified by Scoma:

(1)    he believed, because of what Pavlovic told him, the LSE/SRA was his "employer" and that Pavlovic was their lawyer;

(2)    he was asked by Pavlovic to add this crucial paragraph to his opinion, and did so immediately;

(3)    he had no knowledge as to whether Mr. Mireskandari had the ability to instruct legal representatives, prepare for, attend, and participate in the adjourned hearings;

(4)    he did not even understand what the question meant;

(5)    if he had known that he was going to be engaged as an expert to provide such an opinion, he would have declined, because it was outside his expertise.

162.     Subsequently, the LSE/SRA engaged Bird Marella, the law firm which represented the LSE/SRA in 28 U.S.C. § 1782 application in California in 2009 and again in defense of a Federal Complaint by the present Plaintiffs , to represent Scoma in July 2012 in a matter involving PBW in California state court, again evidencing the improper relationship between Scoma and the LSE/SRA. The LSE/SRA and Scoma never disclosed any communications between Scoma and Bird Marella in the proceedings before the SDT.

163.     As Scoma subsequently testified, and as disclosed documents evidenced:

(1)Scoma during April to June 2012 regarded the LSE/SRA as his "employer";

(2)when Scoma was called for deposition as a witness in relation to the above State and Federal Complaints, Scoma emailed Pavlovic saying that, as his employer, the LSE/SRA had a duty to assist him.

164.     The LSE/SRA not only had no such duty, they had a duty not to engage in conduct which could prejudice the administration of justice, whether in England or abroad. They repudiated that duty, and Pavlovic assisted them to do so, as did Bird. Pavlovic and Bird knew full well of that duty and that the acts they then undertook were in violation of it.

165.     As Scoma further subsequently testified, and as disclosed documents evidenced:

(1)     Pavlovic had Bird contact Scoma;

(2)     Pavlovic was never acting as Scoma's lawyer;

(3)     the LSE/SRA paid Scoma at the rate of $500 for dealing with and attending deposition as a witness of fact;

(4)     Bird liaised with Scoma, and arranged for Coon (a former associate of Bird to represent Scoma;

(5)     the LSE/SRA paid all of Scoma's fees due to Coon;

(6)     Bird billed the LSE/SRA for its partners and associate time in acting in these matters, and the LSE/SRA paid such bills.

166.     By reason of the fiduciary duties which the LSE/SRA owed in relation to funds under its care and management, the payment of Scoma, Coon and Bird constituted theft of such monies. Coon and Bird received such monies, knowing they were the product of theft. Drooks even attended the deposition of Scoma, without notice the Plaintiff Mireskandari's attorney, and insisted on taking 2 hours of the deposition to ask Scoma questions, as if there were in substance some degree of independence between Bird and Scoma. That was a fraud on Plaintiff Mireskandari and on the Court. Coon unlawfully coached Scoma on his deposition testimony,

167.     This entire charade was conducted in order to conceal the gross, unlawful and criminal violation of the independence which Scoma should have had, as an expert owing a duty exclusively to the SDT (and not and never the LSE/SRA). It was a calculated and cynical fraud conducted on the SDT, the English and California Courts, and on Plaintiff Mireskandari. In order to fund that charade, the LSE/SRA stole substantial monies from fiduciary funds, and Pavlovic, Biard, Coon and Scoma each received such money, knowing it to be stolen.

## THE *DAILY MAIL'S* ROLE

168.     Prior to September 2008, the *Daily Mail* conspired with the LSE/SRA to destroy SM.

169.     Upon information and belief, this conspiracy included numerous communications between the LSE/SRA and Daily Mail, as evidenced by the internal September 30, 2008 email, Exhibit A, by which these Defendants shared information, including the LSE/SRA improperly informing the *Daily Mail* of its confidential investigation of SM, such as the trip to Hawaii.  The primary participants in this wrongdoing on behalf of the *Daily Mail* were Defendant Gardner, Steven Wright, and Richard Pendlebury, who co-wrote the September 11, 2008 article about SM.

## GARDNER'S IMPROPER CONDUCT IN CALIFORNIA

170.     In or about September 2008, Gardner, Wright, and Pendlebury agreed that Gardner would obtain information about SM from California to be selectively used to destroy him through false articles published, *inter alia,* in England, California, and the *Daily Mail's* website that is

accessible in California.  In litigation in England, the *Daily Mail* produced two emails sent from California by Gardner and an "investigative report," described below.

171.     According to an email from Gardner to Wright and Pendlebury dated September 3, 2008, Gardner spoke to Patricia Darcy, who had been involved in a telemarketing business with SM in California.  Gardner sent purported quotes from Darcy to be used in destructive media articles about SM.  Upon information and belief, Gardner fabricated a number of quotes in the email in order to provide fodder against SM.  They were also designed to create the false impression he was gay.  For example, the email included a quotation:  "He wasn't married and I don't remember him ever dating.  He spoke about going out with women but I never saw him with one.  It was usually men at the house."  It also included a quotation: "He was very smarmy."  An American like Darcy would not use such a term.

172.     According to an email from Gardner to Wright and Pendlebury dated September 10,

2008, Gardner spoke to Jeffrey Brunton, in Hawaii's Office of Consumer Protection.  Gardner again sent purported quotes from Brunton to be used in the *Daily Mail*.  Upon information and belief, Gardner fabricated a number of quotes to create the false impression SM was being investigated in California. For example, the email included a quotation: "That name is familiar to me. I believe the school which issued his JD was the American University of Hawaii." But Brunton would unlikely have said the name was familiar to him; he had no personal contact with SM in his life and no reason to investigate him.  The email also included the quotation: "I believe his story was that he obtained his degree from the American University of Hawaii." But Brunton would unlikely have said "his story"; he had no reason to know anything about what SM said about his educational background or characterize SM's statement as "his story."  The mail also included the quotation: "I had a couple of gentlemen from London come over earlier this year" referring to Defendants Mayne and Lees.  But Brunton would unlikely have used the common UK term "gentlemen" rather than the normal American term "men" in describing them.

173.     In England, the DM never produced emails from Gardner regarding quotations from an unnamed source who allegedly employed SM, which appeared in a September 11, 2008 *Daily Mail* article. According to the article, the unnamed source stated:

> 'His main academic credential was a bachelor's degree from the University of Pennsylvania. (the university had no record of it). 'Sean had documentation which seemed to support this, although having seen his written work, I am skeptical he could have graduated from any college, at any time. 'Nevertheless, on the strength of this degree and our letter of recommendation, Sean started a law course at a minor local university. 'Unfortunately, he failed his exams miserably at the end of the first semester. He failed his retakes and that was that.

174.     The only persons who employed SM in a law office in California are William O'Bryan, Howard Schechter, and Lawrence Greenbaum. O'Bryan and Greenbaum have denied providing these quotations to Gardner, and Schechter has indicated that he did not provide them. Upon information and belief, Gardner fabricated these quotations and emailed them to Wright and Pendlebury in September 2008 to be included in the article designed to destroy SM.

175.     As part of the conspiracy to destroy SM, the Daily Mail published over 40 articles about him in England, California, and their website. The articles are accessed by use of the wires. The articles included September 11, 2008 and December 2008 articles reporting the LSE/SRA's investigation and subsequent intervention into his law practice. The articles falsely alleged that SM escaped from Iran—accusations that could subject him to severe criminal penalties, including death, in Iran.

## RICO ALLEGATIONS

**The Enterprises**

**LSE/SRA**

176.     **LSE/SRA Enterprise:** The LSE/SRA is an enterprise as defined in 18 U.S.C. § 1961(4) affecting interstate and foreign commerce. The LSE/SRA has many members in the United States who pay dues. The SRA (and its predecessors such as the OSS) are part of the LSE. The LSE/SRA has numerous functions in which it operates legally, including providing member services to solicitors and advocating on their behalf on various public issues. Presumably, it also disciplines solicitors in appropriate circumstances. At the same time, the LSE/SRA has a sorry history of racial discrimination, as evidenced by the Ouseley Report, and engages in illegal activity to destroy those solicitors in its way.

177.     **Conduct and Participation:** Defendants Mayne, Lees, Townsend, and Middleton conducted and participated in the conduct of the LSE/SRA Enterprise through a pattern of racketeering activity. Various persons conspired with Defendants Mayne, Lees, and Townsend, including, but not limited to, Defendants Hegarty, Rahnema, and Rohrbach. Defendants Middleton and Townsend directed the overall attacks on Plaintiffs; they supervised Defendants Mayne and Lees in their investigation, and took advantage of the "rubber stamp" Adjudication Panel and Review Panel in pursuing the investigation of PBW leading to the conditions, which destroyed his practice, and the Intervention, which destroyed SM's practice. Isaacs knowingly used evidence procured illegally to justify striking off PBW.

178.     **Pattern of Racketeering:** The pattern of racketeering activity included related violations of 18 U.S.C. § 1512 (witness tampering); 18 U.S.C. §1952 (Travel Act); 18 U.S.C. § 1343 (wire fraud); and various state statutes such as California Penal Code §§ 136.1, 138 (witness influence, intimidation, and bribery), N.Y. Penal Law § 215.00 (witness bribery); and Virginia Code § 18.2-441.1 (witness bribery), as included in 18 U.S.C. § 1961(1).

179.     **Continuity Plus Relatedness (Pattern) of Conduct:** The pattern began no later than 2004, when Mayne committed acts of 18 U.S.C. § 1343 wire fraud and witness intimidation when telephoning Pinkowski, Alidad, and Tamami in the United States, and continued through April-May-June 2012, when their co- conspirator Rohrbach committed 18 U.S.C. § 1343 wire fraud by lying in a telephone conversation in an attempt to cover-up his own wrongdoing and Pavlovic sent and received *ex parte* emails to Scoma. The pattern of racketeering was open-ended and would have continued until the attacks on PBW and SM were completed. Retaliating against outspoken BME solicitors has become a regular way of doing business for the LSE/SRA. The acts were related, showing the same *modus operandi* of

illegal activity (falsely claiming to be associated with the British government and prosecutors, bribery, witness intimidation) and using the "rubber stamp" Adjudication Panel, Review Panel, and SDT to further the illegal schemes. The same key individuals participated in the pattern (Defendants Middleton, Hegarty, and Mayne).

180.     **Injury in Business By Violation of § 1962(a) (b), (c), and (d):** SM was directly and proximately harmed in his business and property by predicate acts of racketeering, which resulted in the LSE/SRA bringing the Intervention at the behest of the ANL/Daily Mail and destroying his practice, including use of the O'Bryan and Rohrbach witness statements obtained by witness intimidation (18 U.S.C. §1512), wire fraud, Travel Act violations, and state law bribery and witness intimidation. PBW was directly and proximately harmed in his business and property by predicate acts of racketeering which caused him to lose his practice, clients, and business relationships, including those with Pinkowski, Alidad, and Tamami, and intimidated them so as not to act as witnesses in PBW's behalf destroying his practice. The harm was effected by the combined efforts of those conspiring to violate RICO

## LSE/SRA-ANL/DAILY MAIL ASSOCATED-IN-FACT ENTERPRISE

181.     **LSE/SRA-ANL/Daily Mail Enterprise:** The LSE/SRA and ANL- Daily Mail is an associated-in-fact enterprise as defined in 18 U.S.C. § 1961(4) affecting interstate and foreign commerce. **Common Purpose:** The enterprise has a common purpose – to destroy SM – which benefits the LSE/SRA because it eliminates a troublesome solicitor and the ANL/Daily Mail because it eliminates the threat of a libel action while promoting its racist agenda, while also selling newspapers. **Ongoing Organization:** The enterprise has an ongoing organization with the LSE/SRA operating to bring charges against SM in order to destroy SM's legal practice through SDT proceedings with the ANL/Daily Mail operating to bring negative publicity against SM through over 40 articles from September 2008 through 2012. Communications between the two operating arms of the enterprise are facilitated through Steve Wright, the reporter who led the media campaign against SM, and, Negus, the LSE/SRA's public relations director. Unknown persons within the enterprise communicated with one another so that the ANL/Daily Mail was secretly informed of the proceedings against SM, including the December 2008 intervention. **Continuing Unit:** The behavior of the Persons involved in the enterprise was highly coordinated, from Gardner following-up Mayne's and Lees's trip to Hawaii (which the LSE/SRA apparently improperly disclosed to him) so he could report upon it; the LSE/SRA

leaking the investigation into SM to the Daily Mail so it could be reported in the September 11, 2008 and other September 2008 articles; and the LSE/SRA leaking the intervention to the Daily Mail so it could be reported in December 2008. Further, the LSE/SRA and ANL/Daily Mail coordinated in the operation of the enterprise thereafter, with the LSE/SRA informing the ANL/Daily Mail of court hearings so that they could report negatively on SM, further driving the nail into his law practice's coffin from 2009 through 2012.

182.    **Conduct and Participation:** Defendants Mayne, Lees, Townsend, and Middleton conducted and participated in the conduct of the LSE/SRA-ANL/Daily Mail Enterprise through a pattern of racketeering activity. Defendant Gardner, Wright and Pendlebury conducted and participated in the conduct of the LSE/SRA-ANL/Daily Mail Enterprise through a pattern of racketeering activity.

183.    **Pattern of Racketeering:** The pattern of racketeering activity included related violations of 18 U.S.C. § 1512 (witness tampering); 18 U.S.C. §1952 (Travel Act); 18 U.S.C. § 1343 (wire fraud); and various state statutes such as California Penal Code §§ 136.1, 138 (witness influence, intimidation, and bribery), N.Y. Penal Law § 215.00 (witness bribery); and Virginia Code § 18.2-441.1 (witness bribery), as included in 18 U.S.C. § 1961(1).

184.    **Continuity Plus Relatedness (Pattern) of Conduct:** The pattern began no later than June 2008, when Mayne, Lees, and Gardner committed numerous predicate acts of racketeering, and continued through April-May-June 2012, when the LSE/SRA committed 18 U.S.C. § 1343 wire fraud in regard to the secret communications to Dr. Scoma. The pattern of racketeering was open-ended and would have continued until the attack on SM was completed.

185.    **Injury in Business By Violation of §§ 1962(c) and (d):** SM was directly and proximately harmed in his business and property by predicate acts of racketeering, which resulted in the LSE/SRA bringing the Intervention at the behest of the ANL/Daily Mail and destroying his practice, including use of the O'Bryan and Rohrbach witness statements obtained by witness intimidation (18 U.S.C. §1512), wire fraud, Travel Act violations, and state law bribery and witness intimidation. The harm was effected by the combined efforts of those conspiring to violate RICO.

### PREDICATE ACTS OF RACKETEERING

186.    The related predicate acts of racketeering include:

**Travel Act**

187.     The Travel Act, 18 U.S.C. § 1952, prohibits "traveling in interstate or foreign commerce or the use of the mails or any facility in interstate or foreign commerce with the intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity" including "bribery . . . in violation of the laws of the State in which committed or of the United States."

188.     As to SM, Defendants LSE, SRA, Middleton, Townsend, Mayne, and Lees caused the following actions in furtherance of the scheme:

a.     From April 21-27, 2008, Mayne and Lees traveled from Great Britain to the United States, and around the United States, to unlawfully collect evidence for the LSE/SRA's case against SM. During this trip, Mayne and Lees offered bribes to obtain false witness statements and prevent certain individuals from testifying in SM's favor. Additionally, on information and belief, during this trip to the United States, Mayne and Lees used the wires of the United States to contact potential witnesses in furtherance of a scheme or artifice to defraud, as described below.

b.     From July 20-27, 2008, Mayne and Lees traveled from Great Britain to the United States, and around the United States, to unlawfully collect evidence for the SRA's case against SM. During this trip, Mayne and Lees offered bribes to obtain false witness statements and prevent certain individuals from testifying in SM's favor. Additionally, on information and belief, during this trip to the United States, Mayne and Lees used the wires of the United States to contact potential witnesses in furtherance of a scheme or artifice to defraud.

c.     From September 13-17, 2008, Mayne and Lees traveled from Great Britain to the United States, and around the United States, to unlawfully

collect evidence for the SRA's case against SM.  During this trip, Mayne and Lees offered

bribes to obtain false witness statements and prevent certain individuals from testifying in SM's favor.  Additionally, on information and belief, during this trip to the United States, Mayne and Lees used the wires of the United States to contact potential witnesses in furtherance of a scheme or artifice to defraud.

**Wire Fraud**

189.     The Wire Fraud Statute, 18 U.S.C. § 1343, prohibits: "transmit[ting] . . . by means of any wire . . . any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice [to defraud]."

190.     Each of the below acts used, or caused the use of, the United States wires and were all done in furtherance of the scheme or artifice to destroy outspoken BME solicitors like SM and PBW.

191.     As to PBW, Defendants LSE, SRA, Middleton, and Mayne caused the following actions in furtherance of the scheme:

a.     In July 2004, Mayne called Pinkowski in California from England and affirmatively misrepresented, *inter alia*, that his office was involved in the prosecution of PBW for criminal offenses involving tax fraud, and offering compensation if he would help them.

b.     In June or July 2004, Mayne called Alidad in New York from England and affirmatively misrepresented, *inter alia*, that his office was involved in the prosecution of PBW for criminal offenses involving tax fraud, and offering compensation if he would help them.

c.     In June or July 2004, Mayne called Tamami in Washington,

D.C. from England and affirmatively misrepresented, *inter alia*, that his office was involved in the prosecution of PBW for criminal offenses involving tax fraud, and offering

compensation if he would help them.

191.     As to SM, Defendants LSE, SRA, Middleton, Townsend, Mayne, Lees, Gardner, Rahnema, and Rohrbach caused the following actions in furtherance of the scheme:

a.     On or around April 2008, Mayne called Schechter and affirmatively misrepresented that he was a British investigator associated with criminal prosecutors who were investigating SM for serious criminal activity, such as bribing judges and stealing from clients. Mayne made this false statement with the specific intent that Schechter would provide false testimony to Mayne that was harmful to SM, including information that was protected by the attorney-client privilege.

b.     In early April 2008, Mayne called O'Bryan and affirmatively misrepresented that they were British investigators associated with criminal prosecutors who were investigating SM for serious criminal activity, such as bribing judges and stealing from clients.  On this basis, O'Bryan agreed to meet with Mayne and provide his first statement to Mayne and Lees against SM.  Mayne made this false statement with the specific intent that O'Bryan would provide false testimony to Mayne and Lees that was harmful to SM, including information that was protected by the attorney-client privilege.

c.     In early April 2008, Lees called Greenbaum and affirmatively misrepresented that he was a British investigator associated with criminal

prosecutors who were investigating SM for serious criminal activity, such as bribing

judges and stealing from clients. Lees made this false statement with the specific intent that Greenbaum would provide false testimony to Mayne and Lees that was harmful to SM, including information that was protected by the attorney- client privilege.

d.     In early July 2008, on information and belief, Mayne called O'Bryan to obtain further statements detrimental to SM on the ground that the investigation into SM was ongoing. The basis for this belief is that Mayne and Lees obtained two statements from O'Bryan in July 2008, and they would not have simply shown up without first telephoning or emailing him. Based on past known conduct, where Mayne called O'Bryan before meeting him, it is likely that a similar call happened again. Mayne made this false statement with the specific intent that O'Bryan would provide false testimony to Mayne and Lees that was harmful to SM, including information protected by the attorney-client privilege.

e.     In early July 2008, on information and belief, Mayne called Rohrbach to obtain a statement detrimental to SM. The basis for this belief is that Mayne would not have simply shown up without first contacting him. Mayne affirmatively misrepresented that he was a British investigator who was investigating SM for serious criminal activity, such as bribing judges and stealing from clients. Mayne made this false statement with the specific intent that Rohrbach would provide false testimony to Mayne and Lees that was harmful to SM.

f.     In September 2008, on information and belief, Mayne called O'Bryan to obtain another statement detrimental to SM on the ground that the investigation into

SM was ongoing.  The basis for this belief is that Mayne and Lees obtained prior statements from O'Bryan in July 2008, and they would not have simply shown up without first contacting him.  Based on past known conduct, where Mayne called O'Bryan before meeting him, it is likely that a similar call happened again.  Mayne made this false statement with the specific intent that O'Bryan would provide false testimony to Mayne and Lees that was harmful to SM, including information protected by the attorney-client privilege.

g.        On November 3, 2008, Lees telefaxed a letter to Greenbaum stating that Greenbaum felt intimidated by SM.  Lees made this false statement with the specific intent that Greenbaum would not object to it and it could be wrongfully used against SM in the LSE/SRA's proceedings.

h.        In or around early May 2009, the LSE/SRA used the wires in the United States to communicate with their U.S. counsel to file their applications for *ex parte* discovery under 28 U.S.C. § 1782 and their U.S. counsel used the wires to file the applications.

i.        In or about early July 2009, Mayne called Melody Norris and affirmatively misrepresented that SM had serious past criminal convictions, was being criminally investigated for bribing judges, stealing from clients, and other criminal activities.  Mayne also falsely stated that SM's arrest was imminent. Mayne made these false statements with the specific intent to deceive Norris so that she would recant her statement that was favorable to SM and would not testify that SM was not the person the LSE/SRA was portraying him to be.

j.        From the period of 2008 through 2012, on multiple occasions, Mayne called and emailed Rahnema.  In exchange for providing Rahnema with confidential

information that the LSE/SRA planned to shut down SM's law practice, Mayne

obtained Rahnema's cooperation to provide false witness statements against SM

and threaten a witness, as described below.

k.       On April 18, 2012, Rahnema, at the direction of the LSE/SRA,

affirmatively misrepresented by telephone and then email to Dr. Farzam, a medical

witness for SM, that SM was "***THE*** biggest con artist[] ***ANYBODY*** ever

encountered" and that he has "damaged soooo many innocent clients." Rahnema

made these statements with the specific intent that Farzam would not testify in SM's

favor and would "correct [his] absolutely wrong report" (i.e., a report that supported

SM). Rahnema also threatened to "complain against [Farzam] to the Cal.Medical

Society."

l.       On July 12, 2012, Rahnema, at the direction of the LSE/SRA, Middleton,

and Townsend affirmatively misrepresented by telephone to Hayes Michel, SM's

counsel, that SM was a "crook," was "evil," and that SM deserved to suffer.

Rahnema made these statements with the specific intent to discourage Michel from

representing SM in his legal proceedings against Defendants.

m.       In April/May/June 2012, the LSE/SRA, through its solicitors,

sent and received secret emails to/from Dr. Scoma through the wires to

improperly

influence his expert reports, including the wires set forth above, i.e. April 20,

April25, April 26, May 23, May 24, June 8, June 11, June 12, and June 21.

n.       In and after June/July 2012,  the LSE/SRA, Pavlovic, Bird, and Scoma

exchanged emails in June/July 2012 by which the LSE/SRA agreed to pay Bird to

represent Dr. Scoma in proceedings involving PBW and SM.

o.       In September 2008, the LSE/SRA, Middleton, Townsend, Mayne, and

Lees, through Gilbert and Bird, illegally accessed SM's educational records through

the wires by having their agent fraudulently represent that SM had authorized access or she was otherwise entitled to access.

p.        On or about September 2, 2008, Gardner sent an email to Wright and Pendlebury containing fabricated quotations from Darcy

q.        On or about September 10, 2008, Gardner sent an email to Wright and Pendlebury containing fabricated quotations from Brunton;

r.        Upon information and belief, on or before September 10, 2008, Gardner sent an email to Wright and Pendlebury containing fabricated quotations from an unnamed source regarding SM's education.

s.        On September 9, 22, and 23, 2008, Gardner illegally accessed SM's educational records through the wires by fraudulently representing he was authorized access.

t.        The Daily Mail disseminated over 40 articles on SM through its website, which is accessed through the wires in the United States, from September 23, 2008 through 2012.

u.        Rohrbach falsely denied he had heard of Defendant SRA or heard of or met Defendants Mayne and Lees, and signed witness statements during a telephone conversation in June 2012 as set forth above.

## Witness Tampering

## 18 U.S.C. § 1512

192.        The Witness Tampering Statute, 18 U.S.C. § 1512(b) prohibits "corruptly persuad[ing] another person, or attempt[ing] to do so, or engag[ing] in misleading conduct toward another with intent to . . . (1) influence, delay, or prevent the testimony of any person in an official proceeding; (2) cause or induce any person to (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding."

193.    As to SM, Defendants LSE, SRA, Middleton, Townsend, Mayne, and Lees caused the following actions in furtherance of the scheme:

a.    In April, July, and September 2008, Mayne and Lees met with O'Bryan and intimidated him into giving false witness statements against SM. Mayne and Lees claimed

they were investigators closely tied to the British criminal prosecutors, SM was being investigated for serious criminal offenses for which he would likely be serving time in prison, O'Bryan should distance himself from SM, and that the British government would appreciate O'Bryan's help. Similarly, as discussed below, SM is informed and believes, and thereon alleges, that O'Bryan was paid to provide his false statement against SM. Based on this corrupt persuasion, O'Bryan was influenced to provide a false witness statement, which was referenced and thus used in the SRA's application for discovery under 28U.S.C. § 1782, which is an official proceeding as defined by 18 U.S.C. § 1515, filed in Virginia, Washington, D.C., and California in May 2009.

b.    On July 23 and 24, 2008, Mayne and Lees spoke with Rohrbach from the California State Bar and obtained three false statements about SM from him. On information and belief, it is believed that Rohrbach was compensated by Mayne and Lees for his statements. The basis for this belief is that Rohrbach was acting far outside of his authority at the State Bar, was not qualified to give such statements, and was close to bankrupt (and ultimately declared bankruptcy shortly thereafter). Rohrbach's statement, obtained through corrupt persuasion, was referenced and thus used in the SRA's application for discovery under 28 U.S.C. §1782, which is an official proceeding as defined by 18 U.S.C. § 1515, filed in Virginia, Washington, D.C., and California in May 2009.

c.    From April 2012 to June 2012, Pavlovic, and the LSE/SRA tampered with Scoma's expert evidence, and Scoma knowingly participated in this illegal activity;

d.        From June 2012 to January 2013, Pavlovic, Bird and the LSE/SRA:

tampered with Scoma's evidence as a witness of fact to the tampering stated above. It was

specifically found by a California State Judge that Coon had (the Plaintiffs say with the

knowledge and assistance of Bird) "coached" Scoma in deposition.

**California State Law Witness Influence, Intimidation, and Bribery**

194.       California Penal Code § 136.1(a)(2) prohibits "knowingly and maliciously

prevent[ing] or dissuad[ing] any witness from attending or giving testimony at any trial,

proceeding, or inquiry authorized by law." Section 136.1(c) provides the aforementioned conduct

is a felony where it is (1) accompanied by an implied threat of force or (2) in furtherance of a

conspiracy.

195.       California Penal Code § 138(a) prohibits "giv[ing] or offer[ing] or promis[ing] to

give to any witness or person about to be called as a witness, any bribe upon any understanding or

agreement that the person shall not attend upon any trial or other judicial proceeding." Section

138(b) prohibits "receiv[ing], or offer[ing] to receive, any bribe, upon any understanding that his

or her testimony shall be influenced thereby, or that he or she will absent himself or herself from

the trial or proceeding upon which his or her testimony is required."

196.       As to PBW, Defendants LSE, SRA, Middleton, and Mayne caused the following

actions in furtherance of the scheme:

a.        In the summer of July 2004, Mayne contacted Pinkowski, a

PBW client in California, in order to dissuade and deter him from cooperating with

and/or providing any testimony beneficial to PBW, by representing that PBW had put

£750 million outside the UK and was "obviously a criminal" and "bad news" to know.

197.       As to SM, Defendants LSE, SRA, Middleton, Townsend, Mayne, and

Lees caused the following actions in furtherance of the scheme:

a.        In or around April 2008, Mayne offered Schechter and his wife

first class plane tickets and luxury accommodations to travel to London to falsely testify

against SM in the SRA's case.  Such an offer is a bribe that falls within section 138(b)'s proscription against influencing the testimony of a witness.

b.          On or about April 21-27, 2008, Mayne and Lees, who were attempting to speak with Greenbaum, stated to Greenbaum's assistant Baron that they would be willing to pay Greenbaum a considerable sum of money for his time in giving a false statement about SM.  Neither Baron nor Greenbaum accepted the offer.  Mayne and Lees also attempted to intimidate Baron, stating that they were part of a criminal prosecution team investigating SM and acting in an overly hostile and aggressive manner in order to coerce a meeting with Greenbaum.

c.          On July 23 and 24, 2008, Mayne and Lees spoke and met with Rohrbach from the California State Bar and obtained three statements about SM, one which was completely false, from him.  On information and belief, it is believed that Rohrbach was compensated by Mayne and Lees for his statements. The basis for this belief is that Rohrbach was acting far outside of his authority at the State Bar, was not qualified to give such false statements, and was close to bankrupt (and  ultimately declared bankruptcy).

d.          In April, July, and September 2008, Mayne and Lees met with O'Bryan and intimidated him into giving false witness statements against SM. Mayne and Lees claimed they were closely tied to the British criminal authorities, SM was being investigated for serious criminal offenses for which he would likely be serving time in prison, O'Bryan should distance himself from SM, and that the British government would appreciate O'Bryan's help.  Based on these representations, Mayne and Lees elicited several conflicting and false witness statements from O'Bryan.  Mayne and Lees continued to pressure O'Bryan to sign statements for the SRA to use.  Additionally, on information and belief, Mayne and Lees offered to compensate O'Bryan for his

cooperation in giving false statements harmful to SM.  The basis for this belief is that O'Bryan knew SM, and knew the statements that Mayne and Lees were asking for were false (as evidenced by O'Bryan's later contradictory statements), but due to financial hardship, agreed to the statements in exchange for financial compensation.

e.       In or about early July 2009, Mayne contacted Melody Norris, who had provided a favorable statement for SM in his application to set aside the SRA's intervention proceedings.  Knowing that Norris was a favorable witness to SM, Mayne offered Norris $5,000 if she withdrew her statement and agreed not to testify for SM.  Mayne's conduct also constitutes witness intimidation under the statute.  Prior to offering Norris a bribe to withdraw her statement, Mayne stated that it would "not be pleasant" for Norris to go to England and testify for SM as there "could be serious repercussions" for doing so.  Mayne also warned Norris that the judge in the matter was "very sympathetic to the prosecution and may not be kind" toward Norris if she provided favorable evidence.  Mayne stressed that "associating yourself with a criminal like Mireskandari" was "not good for you."

f.       From April 2012 to June 2012, Middleton stole LSE/SRA fiduciary funds to pay Scoma and Bird for Scoma's false and fraudulent testimony and Pavlovic and Bird and Scoma received those stolen monies;

d.       From June 2012 to January 2013, Middleton stole LSE/SRA fiduciary funds to pay Scoma and Bird and Coon for Scoma's testimony and Pavlovic and Bird and Scoma and Coon received those stolen monies.

g.       If the use of such funds in such manner was authorized by MOJ and/or LSB, then MOJ and/or LSB made itself party to a conspiracy to defraud the fiduciary fund held for the solicitors profession in England & Wales.

### New York State Law Witness Bribery

198.       N.Y. Penal Law § 215.00 provides: "A person is guilty of bribing a witness when he confers, or offers or agrees to confer, any benefit upon a witness or a person about to be called as a witness in any action or proceeding upon an agreement or understanding that (a) the testimony of such witness will thereby be influenced, or (b) such witness will absent himself from, or otherwise avoid or seek to avoid appearing or testifying at, such action or proceeding.  Bribing a witness is a class D felony."

199.       As to PBW, Defendants LSE, SRA, Middleton, and Mayne caused the following actions in furtherance of the scheme:

    a.            In 2004, Mayne contacted Alidad and stated that PBW was
    "clearly a criminal," that it was "bad news to know him," and that "the British
    government would be very grateful for any assistance" Alidad could provide them.
    Mayne
    also told Alidad that "the British government would be willing to pay me compensation
    for my time and trouble" if he provided them with a false statement about PBW.

### Virginia State Law Witness Bribery

200.       Virginia Code § 18.2-441.1, bribery of witnesses, provides: "If any person give, offer, or promise to give any money or other thing of value to anyone with intent to prevent such person from testifying as a witness in any civil or criminal proceeding or with intent to cause that person to testify falsely, he shall be guilty of a Class 6 felony."

201.       As to SM, Defendants LSE, SRA, Middleton, Townsend, Mayne, and Lees caused the following actions in furtherance of the scheme:

    a.            In or around August 2008, the LSE/SRA contacted Rahnema
    and told him that he should not pay an outstanding £800,000 judgment SM had
    against Rahnema because the LSE/SRA planned to imminently shut down SM's
    law practice.  The instruction by the LSE/SRA to Rahnema not to pay the £800,000 he

owed SM qualifies as an "other thing of value" and was intended to get Rahnema to

provide false statements and falsely testify against SM.

**Threat to Commit Murder**

202.     It is a violation of California and Virginia state law to commit murder.

203.     On July 12, 2012, Hayes Michel, counsel for SM, spoke to Rahnema on the

telephone from California.  Rahnema threatened "If I see your client, I will shoot him."  Rahnema

has a license to carry a concealed weapon and owns guns.

**CLAIMS FOR RELIEF**

**First Claim For Relief**

**RICO – 18 U.S.C. § 1962(b)**

**SM v. MOJ, LSB, LSE, SRA, Middleton, Townsend, Pavlovic, Bird, Coon and**

**Scoma**

204.     The allegations of the above paragraphs are incorporated herein as if set out in

full.

205.     Defendants LSE, SRA, Middleton, and Townsend, through a pattern of

racketeering activity, acquired, directly or indirectly, control over an enterprise, i.e., SM's legal

practice, which was engaged in activities which affected interstate or foreign commerce.

206.     SM's legal practice was an enterprise which he maintained with numerous clients

in

the United States.  He employed numerous persons in operating the legal practice enterprise.

207.     Defendants LSE, SRA, Middleton, and Townsend took control over SM's legal

practice through the Intervention, which was achieved by a pattern of racketeering activity,

including the use of the false Defendant Rohrbach and O'Bryan and Scoma witness statements and

deposition obtained through violations of 18 U.S.C. § 1512 (witness tampering), 18 U.S.C. § 1952

(Travel Act), 18 U.S.C. § 1343 (wire fraud), and state law bribery and witness intimidation.

208.     SM was directly and proximately harmed by the loss of his law practice enterprise

and profits related thereto caused by the pattern of racketeering activity, including the predicate acts described above.

**Second Claim For Relief**

### RICO – 18 U.S.C. § 1962(c)

**SM v. MOJ, LSB, LSE, SRA, Middleton, Townsend, Pavlovic, Bird, Coon and Scoma and Gardner**

209.     The allegations of the above paragraphs are incorporated herein as if set out in full.

210.     Defendants Middleton, Townsend, Mayne, and Lees were employed by and associated with the LSE/SRA Enterprise, which engaged in, and the activities of which affect, interstate and foreign commerce.  They conducted and participated in, directly or indirectly, the conduct of the LSE/SRA Enterprise through a pattern of racketeering activity, including the use of the false Defendant 28 Rohrbach and O'Bryan witness statements obtained through the predicate acts described above.

211.     Defendant Gardner was employed and associated with the ANL/Daily Mail Enterprise, which engaged in, and the activities of which affect, interstate and foreign commerce.  He conducted and participated in, directly or indirectly, the conduct of the ANL/Daily Mail Enterprise through a pattern of racketeering activity, including the September, 2008 email predicate acts described above.

212.     Defendants Middleton, Townsend, Mayne, Lees, Gardner, LSE/SRA, and ANL/Daily Mail were associated with the LSE/SRA-ANL/Daily Mail associated-in-fact enterprise,

which engaged in and the activities of which affect, interstate and foreign commerce.  They conducted and participated in, directly or indirectly, the conduct of the LSE/SRA-ANL/Daily Mail Enterprise through a pattern of racketeering activity, described above.

213.     SM was directly and proximately harmed by the loss of control of his law practice enterprise and profits related thereto caused by the pattern of racketeering activity, including the

predicate acts described above.

**Third Claim For Relief**

### RICO – 18 U.S.C. § 1962(d)

### SM v. MOJ, LSB, LSE/SRA, Middleton, Townsend, Mayne, Lees, Hegarty, Rohrbach, Pavlovic, Bird, Coon and Scoma and Gardner

214.     The allegations of the above paragraphs are incorporated herein as if set out in full.

215.     Defendants Middleton, Townsend, Mayne, Lees, Hegarty, Rohrbach, and Rahnema conspired to commit the violations of 18 U.S.C. § 1962(b) and (c) described above which harmed SM as described above.

216.     Defendants Middleton, Townsend, Mayne, and Lees conspired to violate 18 U.S.C. § 1962(b) and (c) by Defendants Mayne and Lees committing numerous acts of racketeering activity at the direction of Middleton and Townsend.

218.     Defendant Hegarty conspired with Defendants Middleton and Townsend by agreeing to "rubber stamp" the requests of the SRA to intervene in SM's law practice to achieve the overall goal of the illegal scheme to destroy SM's law practice and disbar him.

219.     Defendant Rohrbach conspired with Defendants Mayne and Lees, knowing they were committing predicate acts of wire fraud and bribery, and committing his own acts of wire fraud by sending knowingly false witness statements to them to achieve the overall goal of the illegal scheme to destroy SM's law practice and disbar him, and later lying about his involvement in a telephone call, as described above.  Upon information and belief, Rohrbach conspired with Defendants Mayne and Lees because of his financial interest and also because he was induced to believe that SM was subject to criminal proceedings in England and that the "ends justified the means" in debarring SM. Upon information and belief, at no time did Defendant Rohrbach believe that he could be prosecuted for perjury in England for signing handwritten statements in the United States.

220.     Rahnema conspired with the persons conducting and operating the LSE/SRA Enterprise by agreeing not to pay the monies which he owed to SM, knowing that the LSE/SRA could use the lack of monies in SM's firm to support the allegation that the firm was financially insecure in order to achieve the overall goal of the illegal scheme to destroy SM's law practice and disbar him. He also conspired with the LSE/SRA by sending the email threatening Farzam if he did not cease to assist SM in the English proceedings.  Defendant Rahnema joined in the conspiracy because he believe that debarring SM and destroying his practice would enable him to avoid paying the judgment entered against him.

221.     ANL/Daily Mail through, *inter alia*, Wright conspired with the persons conducting and operating the LSE/SRA Enterprise through, *inter alia*, Negus by agreeing to engage in a joint campaign to destroy SM by which the LSE/SRA knew that the ANL/Daily Mail would engage in acts in California through Gardner, and the ANL/Daily Mail knew that the LSE/SRA would engage in acts in California which were designed to achieve the overall goal of the illegal scheme to destroy SM's law practice and disbar him.

222.     Defendants  LSE/SRA, ANL/Daily Mail,  Middleton, Townsend, Mayne, Lees, and Gardner conspired with the persons conducting and operating the LSE/SRA-ANL/Daily Mail Enterprise by agreeing to engage in a joint campaign to destroy SM by which they knew that the ANL/Daily Mail would engage in acts in California and Hawaii through Gardner, and the ANL/Daily Mail knew that the LSE/SRA would engage in acts in California which were designed to achieve the overall goal of the illegal scheme to destroy SM's law practice and disbar him. They also knew that the LSE/SRA would seek to intervene in SM's practice and the Daily Mail would provide cover through negative and false reporting. Defendant Hegarty conspired with persons operating the LSE/SRA-ANL-Daily Mail Enterprise as set forth above.

**Fourth Claim For Relief**

RICO – 18 U.S.C. § 1962(b)

**PBW v. MOJ, LSB, LSE, SRA, and Middleton**

223.    The allegations of the above paragraphs are incorporated herein as if set out in full.

224.    Defendants LSE, SRA (successor to OSS), and Middleton, through a pattern of racketeering activity, acquired, directly or indirectly, control over an enterprise, i.e., PBW's legal practice, which was engaged in activities which affected interstate or foreign commerce.

225.    PBW's legal practice was an enterprise, which he maintained with numerous clients in the United States.  He employed numerous persons in operating the legal practice enterprise.

226.    Defendants LSE, SRA, and Middleton took control over PBW's legal practice through imposing conditions on him which prevented him from representing trusts, which was achieved by a pattern of racketeering activity, including wire fraud, knowing that this would destroy his practice.  These conditions were achieved, *inter alia*, by improperly dissuading witnesses to cooperate with PBW.

227.    PBW was directly and proximately harmed by the loss of control of his law practice enterprise and profits related thereto caused by the pattern of racketeering activity, including the predicate acts described above.

**Fifth Claim For Relief**

**RICO – 18 U.S.C. § 1962(c)**

**PBW v. MOJ, LSB, Middleton and Mayne**

228.    The allegations of the above paragraphs are incorporated herein as if set out in full.

229.    Defendants Middleton and Mayne were employed and associated with the LSE/SRA (successor to OSS) Enterprise which engaged in, and the activities of which affect, interstate and foreign commerce.  They conducted and participated in, directly or indirectly, the

1   conduct of the LSE/SRA Enterprise through a pattern of racketeering activity, including wire

2   fraud.

3   230.        PBW was directly and proximately harmed by the loss of his law practice and

4   profits related there caused by the pattern of racketeering activity, including the predicate acts

5   described above.

6

7   **Sixth Claim For Relief**

8                                 **RICO – 18 U.S.C. § 1962(d)**

9                        **PBW v. MOJ, LSB, Middleton, Mayne, and Hegarty**

10   231.        The allegations of the above paragraphs are incorporated herein as if set out in full.

11   232.        Defendants Middleton, Mayne, and Hegarty conspired to commit the violations of

12   18 U.S.C. § 1962(b) and (c) described above and harmed PBW as described above.

13   233.        Defendants Middleton and Mayne conspired to violate 18 U.S.C. §1962(b) and (c)

14   by Defendant Mayne committing numerous acts of racketeering activity at the direction of

15   Middleton and Townsend, including witness intimidation and wire fraud.

16

17   234.        PBW was directly and proximately harmed by the loss of his law practice and loss

18   of clients caused by the pattern of racketeering activity, including the predicate acts described

19   above.

20

21   **Seventh Claim For Relief**

22                    **Computer Fraud and Abuse Act – 18 U.S.C. § 1030**

23   **SM v. MOJ, LSB, LSE, SRA, Middleton, Townsend, Mayne, Lees, Gilbert, and Bird**

24

25   235.        The allegations of the above paragraphs are incorporated herein as if set out in full.

26   236.        At all times relevant herein, the student record information computer database of

27   the National Student Clearinghouse, as accessible through a website portal, was and is information

28   on a protected computer as defined by 18 U.S.C. §1030(e)(2)(B).

237.      Defendants LSE, SRA, Middleton, Townsend, Mayne, and Lees, through Gilbert and Bird, purposefully and intentionally accessed the National Student Clearinghouse computer database without authorization and exceeding authorized access limits, obtaining protected computer information in the form of educational records, regarding SM. G i l b e r t  accessed the records by computer and falsely "clicked the box" that SM had authorized access his records when he had not done.

238.      The aforementioned conduct involved interstate and foreign communications.

239.      The aforementioned conduct caused a loss to SM during a one-year period in excess of $5,000, in accordance with 18 U.S.C. § 1030(a)(5)(B)(i) and (g).

**Eighth Claim For Relief**

**Intentional Interference with Actual Contractual Relationships**

**PBW v. Mayne, Middleton, LSE, SRA, LSB and MOJ**

240.      The allegations of the above paragraphs are incorporated herein as if set out in full.

241.      PBW was the beneficiary of existing and valuable business relationships.

242.      Defendants were aware of these actual relationships and engaged in intentional and wrongful conduct designed or calculated to disrupt and interfere with those relationships.

243.      PBW was the beneficiary to numerous business relationships related to his law practice, including with Nicholas Pinkowski, Aliad Mireskandari, and Mehran Tamimi.

244.      As a direct and indirect result of Defendants' conduct, these parties and others terminated their business relationships.

245.      Defendants engaged in, and continued on a course of, wrongful conduct such that these relationships were interfered with and disrupted.

246.      Defendants' conduct in interfering with such actual business relationships was

intentional, malicious, and without justification. Defendants' conduct was not privileged or excused and was without any legitimate justification. Defendants knowingly engaged in such wrongful conduct for the purpose of destroying PBW's legal practice and business relationships.

247.　　　Defendants' conduct was a substantial factor in causing financial injury to PBW.

248.　　　The intentional and disruptive conduct of Defendants was willful, malicious, and oppressive. Consequently, an award of exemplary or punitive damages in an amount sufficient to punish and deter Defendants is justified.

**Ninth Claim For Relief**

**Defamation (1)**

**PBW v. LSE, SRA, Mayne, Middleton, LSB and MOJ**

249.　　　The allegations of the above paragraphs are incorporated herein as if set out in full.

250.　　　PBW is a private figure.

251.　　　According to Pinkowski, in 2004, Mayne called him in California. Mayne stated his office was involved in prosecution of PBW for criminal offenses involving tax fraud. Mayne falsely represented that his office had uncovered evidence that £750 million of funds had been illegally placed outside of the United Kingdom by PBW and that the UK tax authorities were very concerned. Mayne further stated that PBW was "obviously a criminal" and "bad news" and that "the British government would be very grateful for any assistance that [Pinkowski] could give them."

252.　　　Similarly, in 2004, Mayne telephoned Alidad. Mayne said substantially the same things to Alidad that he had said to Pinkowski.

253.　　　Finally, in 2004, Mayne also telephoned Tamami. Mayne said substantially the same things to Tamami that he did to Alidad and Pinkowski.

254.　　　These statements were false. These defamatory statements denigrated PBW's

integrity, casting his character and credibility in a negative light, and constituted defamation *per se*,

as falsely imputing criminal activity to PBW. Mayne, acting on behalf of the LSE and SRA and at the direction of Middleton, knew these statements were untrue and made them with actual malice.

255.      As a consequence of the defamatory statements made on behalf of LSE and SRA, by Mayne to Pinkowski, Pinkowski ceased being a client of PBW and canceled his retainer agreement in 2004.  Alidad and Tamami also ceased their business relationships with PBW as a result of the calls.

256.      Despite the exercise of due diligence, PBW had no way of learning about this egregious defamation.  Finally, Pinkowski revealed to PBW that he had been defamed by Defendants, as stated above, in 2004.

257.      Defendants failed to use reasonable care to determine the truth or falsity of these statements.

258.      The recipients of these defamatory statements concerning PBW understood that Defendants' statements were about PBW.

259.      Defendants' wrongful conduct was a substantial factor proximately causing harm to PBW resulting in injury to his reputation, loss of profits, and loss of future profits.

**Tenth Claim For Relief**

### Defamation (2)

### SM v.  LSB, MOJ, LSE, SRA, Mayne, Lees, Middleton, and Townsend

260.      The allegations of the above paragraphs are incorporated herein as if set out in full.

261.      SM is a private figure.

262.     Defendants Mayne and Lees made their statements on behalf of the LSE/SRA and atthe direction of Middleton and Townsend.

263.     Mayne and Lees defamed SM to **Rohrbach** in California. Mayne and Lees claimed to represent British criminal prosecution authorities investigating SM for criminal offenses including the bribing of a judge.

264.     Mayne and Lees defamed SM to **O'Bryan**. During their conversations with O'Bryan in California in April, July, and September of 2008, Mayne and Lees claimed to represent British criminal prosecution authorities investigating SM for criminal offenses including the bribing of a judge. Mayne and Lees also claimed that SM had a felony record in California and that O'Bryan should distance himself from SM.

265.     Mayne defamed SM to **Melody Norris**. In early July 2009, Norris received a call in Los Angeles, California from Mayne, who stated that he was calling for, and on behalf of, the SRA. Mayne falsely stated that SM was under investigation from taking monies from clients and bribing judges.

266.     Defendants similarly defamed SM to **Howard Schechter**, which encouraged Schechter to make derogatory statements concerning SM to the *Daily Mail*. Mayne and Lees stated that they were from the prosecutor's office in England and they were part of a criminal investigation concerning the criminal conduct of SM. On this basis, they encouraged Schechter to act as their agent in attempting to convince Greenbaum to provide them with similarly attorney-client privileged information.

267.     Mayne and Lees defamed SM to **Anthony Baron**, legal assistant to **Lawrence Greenbaum**, in Sherman Oaks, California in April 2008. Mayne stated that he and Lees were from the prosecutor's office in England and that they were part of a criminal investigation concerning the criminal conduct of SM. When Baron explained that Greenbaum would not discuss matters regarding   a former client, Mayne emphasized that they were prosecutors from England and that it was important for them to meet with Greenbaum. They claimed the matter was urgent.

268.      Each of these statements was untrue and a falsehood, and Defendants failed to use reasonable care to determine the truth or falsity of these statements. Each denigrated SM's integrity, casting his character and credibility in a negative light, and constituted defamation *per se*, as falsely imputing criminal activity to SM.  Defendants knew these statements were untrue, and made them with actual malice.

269.      As a former police officer, Mayne was well aware of the distinction between his work for the SRA and a criminal investigation.  SM was never under criminal investigation in England.  Moreover, Defendants would not have been in any way involved with that hypothetical investigation.  Mayne and Lees knew that both of Mayne's assertions were false and intended to mislead and injure SM.  The defamatory statements were therefore uttered with actual malice.

270.      These slanderous falsehoods also added tension to SM's personal relationships. For example, O'Bryan refused to speak with him.

271.      The recipients of these defamatory statements concerning SM reasonably understood that Defendants' statements were about SM.

272.      Defendants' wrongful conduct was a substantial factor in proximately causing harm to SM's reputation, loss of profits, and loss of future profits.

273.      SM did not discover that Defendants made the foregoing false and derogatory factual representations about him until June or July 2011.  SM had no way of earlier discovering this defamation, even with a reasonable investigation.

**Eleventh Claim For Relief**

### RICO – 18 U.S.C. § 1962(a) -(d)

### SM v. MOJ, LSB, LSE, SRA, Middleton, Townsend, Moncrieff, Hudson, Pavlovic, Bird, Coon and Scoma

274.      As provided by 18 USC § 1962:

"(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

*Scoma*

275.     As pleaded above, in 2012 Scoma knowingly gave false evidence to the SDT. He did so at the instructions of Pavlovic, acting with the authority of Middleton.

276.     Scoma billed the LSE/SRA at the rate of $500 per hour for the said fraudulent activity. That was "an unlawful debt".

277.     The debt was paid out of money stolen by Middleton from the fiduciary account of the LSE/SRA, and transmitted by wire via Pavlovic and Bird. Scoma accordingly received "income" from that "unlawful debt".

278.     Scoma used that "income" to maintain protection or cover up of the fraudulent

activity in the operation of that enterprise to strike off SM (in his absence on true medical grounds), and to then cover up that enterprise. That enterprise engaged in and/ or the activities of which affected, interstate or foreign commerce.

279.     Scoma knew that he had given false evidence and that he had been paid, as alleged, for doing so.

280.     Accordingly, Scoma violated 18 USC § 1962(a) and/or (b) and/or (c) and (d).

*Bird and Coon*

281.     After SM's striking off, SM pursued his statutory right of appeal in the English Courts. In pursuit of that right, SM obtained an order of the San Diego Court for discovery and deposition in relation to Scoma.

282.     Middleton and Bird were worried that the fraudulent nature of the expert evidence which Middleton had (via Pavlovic) procured Scoma to give, would be revealed.

283.     By this point in time, Scoma had discharged his formal duty as expert to the SDT. He had given his evidence as expert. The SDT had made and published its decision. Scoma was summoned by SM as a witness of fact.

284.     Accordingly, the LSE/SRA had no legitimate interest whatsoever in Scoma's prospective factual testimony. Indeed, given that Middleton knew that Scoma had lied in Scoma's expert evidence, Middleton knew that Scoma's prospective factual testimony was antithetical to the interests of him and the LSE/SRA.

285.     Bird had the same knowledge.

286.     Coon had the same knowledge.

287.     Bird billed the LSE/SRA (being avowed organs of the British State) for the work of Mark Drooks and Jessica Chen in arranging for Scoma to be represented by Coon, for Drooks attending Scoma's deposition, and for arranging transfer of monies from LSE/SRA to Scoma and Coon.

288.     That Bird billing was "an unlawful debt".

289.        The debt was paid out of money stolen by Middleton from the fiduciary account of the LSE/SRA, and transmitted by wire via Pavlovic to Bird. Bird accordingly received "income" from that "unlawful debt".

290.        Bird used that "income" to maintain protection or cover up of the fraudulent activity in the operation of that enterprise to strike off SM (in his absence on true medical grounds), and to then cover up that enterprise. That enterprise engaged in and/ or the activities of which affected, interstate or foreign commerce.

291.        Accordingly, Bird violated 18 USC § 1962(a) and/or (b) and/or (c) and (d).

292.        Coon has specifically admitted that she billed the LSE/SRA (being avowed organs of the British State) for her work in representing Scoma.

293.        That Coon billing was "an unlawful debt".

294.        The debt was paid out of money stolen by Middleton from the fiduciary account of the LSE/SRA, and transmitted by wire via Pavlovic to Bird and thence to Coon. Coon accordingly received "income" from that "unlawful debt".

295.        Coon used that "income" to maintain protection or cover up of the fraudulent activity in the operation of that enterprise to strike off SM (in his absence on true medical grounds), and to then cover up that enterprise. That enterprise engaged in and/ or the activities of which affected, interstate or foreign commerce.

296.        Accordingly, Coon violated 18 USC § 1962(a) and/or (b) and/or (c) and (d).

**Middleton**

297.        Middleton was the principal who directed all of the said alleged illegal actions.

298.        Accordingly, Middleton violated 18 USC § 1962(a) and/or (b) and/or (c) and (d).

299.        Townsend, Moncrieff and Hudson were in office when these illegal acts, including theft of LSE/SRA fiduciary funds took place. They either authorized the commission of such illegal acts, or exercised willful blindness as to their commission.

309.     Each of Middleton and Mayne used that "income" to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. That enterprise engaged in and/ or the activities of which affected, interstate or foreign commerce.

310.     Each of Middleton and Mayne was a person "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, who conducted or participated directly in the conduct of such enterprise's affairs through collection of unlawful debt."

311.     Middleton and Mayne conspired together to do so.

312.     Accordingly, Middleton and Mayne each violated 18 USC § 1962 (b) and/or (c) and (d).

**Thirteenth Claim For Relief**

### RICO – 18 U.S.C. § 1962(a)-(d)

### SM and PBW v. Middleton, Mayne, Lees, Townsend, Hudson, Moncrieff, Pavlovic, Hegarty, and Isaacs

313.     The provisions of 18 USC § 1962 are repeated.

314.     Each of the individuals named above took money from funds solely acquired from practicing certificate fees paid by English qualified solicitors, including (as Middleton avowed in sworn declaration before the Federal Court), from individuals resident in the United States and the State of California. Until 2010, all expenses of the SDT and its members (including Isaacs) were paid out of LSE funds. The fees and expenses charged by Hegarty of Adjudication work were paid out of LSE funds. The salaries and expenses and pension benefits paid to or in respect of Middleton, Mayne, Lees, Townsend, Hudson, Moncrieff, were paid out of LSE funds. The salaries and expenses and pension benefits paid to or in respect of all other SRA employees, whose

assistance in the acts pleaded above Middleton procured , were paid out of LSE funds. The sums paid to Pavlovic were paid out of LSE funds.

315.  Such funds were held in trust for use exclusively on expenditure for the legitimate and lawful purposes of LSE/SRA. Such funds could never be lawfully used for any unlawful or illegal or other illegitimate purpose.

316. Such funds were so paid from 2002 and continue to be so paid.

317.  Each such person who received such payment was a person "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, who conducted or participated directly in the conduct of such enterprise's affairs through collection of unlawful debt."

318.      Each such person conspired together to do so.

319.      Accordingly, each such person violated 18 USC § 1962 (c) and (d).

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs Shahrokh Mireskandari and Paul Baxendale-Walker pray that this

Court award the following relief against Defendants, as follows:

1.      For general and special damages according to proof at trial in excess of $5 million for PBW and $5 million for SM;

2.      For statutory trebling of damages under RICO;

3.      For prejudgment interest at the applicable rate;

4.      For attorneys' fees and costs of suit under RICO; and

5.      For such other relief as the Court deems just and proper.


Dated:  J u l y   1 , 2013

By: …………………………………..


SHAHROKH MIRESKANDARI and


By:


PAUL BAXENDALE-WALKER


## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) and Local Rule 38-1 on all claims so triable.


Dated:  J u l y   1 , 2013


By:  …………………………………..


SHAHROKH MIRESKANDARI


and

1
2
3
4          By:
5
6              PAUL BAXENDALE-WALKER
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

assistance in the acts pleaded above Middleton procured , were paid out of LSE funds. The sums paid to Pavlovic were paid out of LSE funds.

315.  Such funds were held in trust for use exclusively on expenditure for the legitimate and lawful purposes of LSE/SRA. Such funds could never be lawfully used for any unlawful or illegal or other illegitimate purpose.

316. Such funds were so paid from 2002 and continue to be so paid.

317.  Each such person who received such payment was a person "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, who conducted or participated directly in the conduct of such enterprise's affairs through collection of unlawful debt."

318.      Each such person conspired together to do so.

319.      Accordingly, each such person violated 18 USC § 1962 (c) and (d).


## PRAYER FOR RELIEF

WHEREFORE Plaintiffs Shahrokh Mireskandari and Paul Baxendale-Walker pray that this

Court award the following relief against Defendants, as follows:

1.      For general and special damages according to proof at trial in excess of $5 million for PBW and $5 million for SM;

2.      For statutory trebling of damages under RICO;

3.      For prejudgment interest at the applicable rate;

4.      For attorneys' fees and costs of suit under RICO; and

5.      For such other relief as the Court deems just and proper.


Dated:  J u l y   1 , 2013


By:

.............................................

SHAHROKH MIRESKANDARI and

1

2   By:

3

4   PAULBAXENDALE-WALKER

5

6

7

8   **DEMAND FOR JURY TRIAL**

9   Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b)

10  and Local Rule 38-1 on all claims so triable.

11

12  Dated:  J u l y   1 , 2013

13

14

15

16  By:

17

18  SHAHROKH MIRESKANDARI

19

20  and

21

22

23  By:

24

25  PAULBAXENDALE-WALKER

26

27

28

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☒ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| SHAHROKH MIRESKANDARI and PAUL BAXENDALE WALKER | BARRINGTON MAYNE, MALCOLM LEES, ANTONY TOWNSEND AND OTHERS |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) 9903 SANTA MONICA BLVD, SUITE 406, BEVERLY HILLS, CA 9021: 310.286.0500 | (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) |
|---|---|

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff
☒ 3. Federal Question (U.S. Government Not a Party)
☐ 2. U.S. Government Defendant
☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No ☒ **MONEY DEMANDED IN COMPLAINT: $** OVER $5M

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT R.I.C.O, COMPUTER FRAUDS AND ABUSE ACT, INTENTIONAL INTERFERENCE WITH CONTRACT AND DEFAMATION.

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☒ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☒ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpratice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

FOR OFFICE ONLY: Case Number: **CV13-4796**

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

CV-71 (02/13)          CIVIL COVER SHEET          Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?   ☐ NO   ☒ YES

If yes, list case number(s):   CV 12-03861 MMM-FMOx

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☒ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| SHAHROKH MIRESKANDARI - LOS ANGELES | PAUL BAXENDALE WALKER - LONDON, ENGLAND |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES | SAN DIEGO, ENGLAND |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGLELES | VIRGINIA, NEW YORK, WASHINGTON, ENGLAND, SAN DIEGO |

*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _____   DATE: July, 2, 2013

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dolly Gee and the assigned discovery Magistrate Judge is Charles Eick.

The case number on all documents filed with the Court should read as follows:

## CV13- 4796 DMG (Ex)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[_] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[_] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.